FILED UNDER SEAL PER COURT ORDER

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| MARY CLAIRE L. MCCOY | CIVIL ACTION NO. 19-01810 |
| VERSUS | SECTION "S" |
| | DISTRICT JUDGE LEMMON |
| ISIDORE NEWMAN SCHOOL AND ██████████ | MAG. DIV. (5) |
| | MAG. JUDGE NORTH |

### *DAUBERT* MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF PLAINTIFF'S PSYCHIATRIC EXPERT, DR. EILEEN RYAN

**NOW INTO COURT**, through undersigned counsel, comes Defendant, Isidore Newman School ("Newman"), who submits this *Daubert* Motion to Exclude or Limit the Testimony of Plaintiff's Psychiatric Expert, Dr. Eileen Ryan. Dr. Ryan's testimony should be limited because she opines on wholly irrelevant matters, including the mental health of non-parties to this case. As such, her testimony is unhelpful, distracting, and will only confuse the jury. Dr. Ryan's testimony should also be excluded to the extent she relies on outdated and obsolete diagnostic materials and scholarly sources. As such, her opinions are not based on reliable principles and methods. Moreover, Dr. Ryan's testimony should be limited because she provides fundamentally unsubstantiated—and in fact contradicted— opinions that Plaintiff will require treatment for PTSD for the remainder of her life, that Plaintiff will *continue* to experience work-related difficulties, and that Plaintiff will require 30 to 90 days of inpatient treatment at a dual diagnosis residential treatment facility. These speculative opinions are not helpful to a jury and should therefore be excluded. For the foregoing reasons, and as more fully explained in Newman's Memorandum in Support of this Motion, Newman requests that the testimony of Dr. Ryan be excluded or limited.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY: ___/s/ Harry Rosenberg_____
HARRY ROSENBERG (#11465)
KIM M. BOYLE (#18133)
REBECCA SHA (#35317)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
E-mail:   harry.rosenberg@phelps.com
              kim.boyle@phelps.com
              rebecca.sha@phelps.com

**ATTORNEYS FOR DEFENDANT, ISIDORE NEWMAN SCHOOL**

**<u>CERTIFICATE OF SERVICE</u>**

I do hereby certify that on this 24th day of August, 2021 a copy of the foregoing sealed pleading was securely emailed to the email address listed in the Court's March 20, 2020 Notice Regarding Sealed Pleadings and Facsimile Filing of Paper Documents and a copy of said filing was served via e-mail upon all counsel of record.

___/s/ Harry Rosenberg_____

┌─────────────────────────────────────────────────────┐
│           *FILED UNDER SEAL PER COURT ORDER*          │
└─────────────────────────────────────────────────────┘

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**MARY CLAIRE L. MCCOY**                    **CIVIL ACTION NO. 19-01810**

**VERSUS**                                  **SECTION "S"**
                                            **DISTRICT JUDGE LEMMON**
**ISIDORE NEWMAN SCHOOL AND**
██████████████                              **MAG. DIV. (5)**
                                            **MAG. JUDGE NORTH**

## MEMORANDUM IN SUPPORT OF
## *DAUBERT* MOTION TO EXCLUDE OR LIMIT THE TESTIMONY OF PLAINTIFF'S PSYCHIATRIC EXPERT, DR. EILEEN RYAN

**MAY IT PLEASE THE COURT:**

Defendant, Isidore Newman School ("Newman") submits this Memorandum in Support of its *Daubert* Motion to Exclude or Limit the Testimony of Plaintiff's Psychiatric Expert, Dr. Eileen Ryan. Newman respectfully submits that the expert opinion of Dr. Ryan should be excluded or limited because she opines on irrelevant matters, offers fundamentally unsupported and nonsensical opinions, and does not employ reliable principles and methods, insofar as she relies on outdated diagnostic materials. As such and for the reasons further outlined in this memorandum, Newman respectfully requests that this Court grant the instant motion and exclude the expert testimony of Dr. Ryan.

## I.    BACKGROUND

This case involves Plaintiff's claims against Newman alleging violations of Title IX, negligence, and negligent infliction of emotional distress related to Newman's handling of a report of an alleged off-campus ██████████████ Plaintiff and ██████████████ which reportedly took place on December 27, 2016. Plaintiff alleges Newman violated Title IX because

of its "post-report deliberate indifference"[1] and its "retaliation" against her.[2]  Plaintiff also asserts

claims against Newman for negligence[3] and negligent infliction of emotional distress[4] related to

Newman's alleged failure to exercise her expectations of supervision and control over Newman

students and parents that allegedly caused Plaintiff to suffer emotional distress.

In connection with her allegations, Plaintiff seeks damages in the form of: (a) past, present,

and prospective emotional pain and emotional suffering, depression, anxiety, mental anguish, and

emotional trauma; (b) past, present, and prospective medical expenses and other related healthcare

charges; (c) prospective wage loss and/or diminution of earning capacity due to the damage to

reputation and projected long-term effects of the depression, anxiety, mental anguish, and

emotional trauma; and (d) loss of enjoyment of life.[5]

Plaintiff identified Eileen Ryan, D.O. as a psychiatric expert to provide an opinion about

Plaintiff's mental health, symptoms, and prognosis.  Dr. Ryan opines that Plaintiff meets the

criteria in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") for PTSD; panic

disorder, without agoraphobia; major depressive disorder; and alcohol use disorder, mild. Dr. Ryan

opines on the likelihood that Plaintiff will overcome these disorders and provides a prognosis for

her future treatment needs.

Dr. Ryan's testimony should be limited to preclude her from discussing many of the

irrelevant topics included in her expert report, including the mental health of Plaintiff's family and

---

[1] R. Doc. 37 at ¶¶ 196-211 (Count I: Violation of the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681, *et seq.* (Against Newman) Post-Report Deliberate Indifference)(emphasis added).

[2] R. Doc. 37 at ¶¶ 212-216 (Count II: Violation of the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681, *et seq.* (Against Newman) Retaliation).

[3] R. Doc. 37 at ¶¶ 217-223 (Count III: Louisiana State Law Negligence (Against Newman)).

[4] R. Doc. 37 at ¶¶ 224-227 (Count IV: Emotional Distress Damages under Article 2315 for the Negligent Infliction of Emotional Distress (Against Newman and ████

[5] *See* R. Doc. 37 at ¶ 234.

2

close friend, ███████. Further, Dr. Ryan's expert testimony should be excluded as unreliable

to the extent she relies on an outdated version of the DSM and similarly outdated scholarly sources

and because her opinion contradicts the current DSM-5 and timely scholarly sources. Moreover,

Dr. Ryan's testimony should be excluded as fundamentally unsupported, and therefore unhelpful,

and more prejudicial than probative, insofar as she failed to even consider the contemporaneous

medical records of Plaintiff's psychologists prior to the December 27, 2016 ████████

pre-existing symptoms of anxiety, depression, psychosis, and personality disorders, speculates that

Plaintiff will never recover from PTSD, will require lifelong treatment, and will "continue" to

experience work-life difficulties. Newman respectfully requests that the Court grant the instant

Motion and exclude or limit the so-called expert testimony of Dr. Ryan.

## II.   LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Civil Procedure 702,

which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.[6]

Thus, expert testimony is permissible where the expert's "specialized knowledge" will assist the

trier of fact, and his testimony is based on "sufficient facts or data" and "reliable principles and

methods."

---

[6] FED. R. EVID. 702.

PD.35029858.2

As a threshold issue, for a witness to testify as an expert, the witness must be qualified as such "by knowledge, skill, experience, training, or education."[7]  Indeed, under *Daubert* and its progeny, a "district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject."[8]  Assuming that an expert witness is qualified, the trial court acts as a "gatekeeper" to ensure that expert opinion evidence "is not only relevant but reliable."[9]

First, to determine whether the proffered testimony is reliable, the trial court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning and methodology has been properly applied to the present case.[10]  The burden to demonstrate that an expert's findings and conclusions are based on a valid scientific method, and are therefore reliable, is placed on the party seeking their admission.[11]  The determination of reliability itself, as well as the factors that must be taken into account in determining the issue of reliability, are within the discretion of the court, consistent with its "gatekeeping function" under the Federal Rules of Evidence.[12]

The general considerations guiding this inquiry include: (a) whether the theory or technique can or has been tested; (b) whether the theory or technique has been subjected to peer review or publication; (c) the known or potential rate of error; (d) the existence and maintenance of standards and controls; and (e) whether the theory or technique is generally accepted by those who work in

---

[7] *Id.*

[8] *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).

[9] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[10] *See Daubert*, 509 U.S. at 589, 593-95.

[11] *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (*en banc*).

[12] *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

the field of expertise at issue.[13] The reliability prong of the *Daubert* analysis also imposes an implicit requirement that the testimony be grounded "in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief."[14]

Second, to determine if the testimony is relevant, the trial court must decide whether an expert's reasoning or methodology can be applied properly to the facts at issue.[15] In other words, an expert's testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."[16] Stated otherwise, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence; in other words, whether it is relevant.[17]

When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony.[18] "To meet this burden, [the party seeking to present the testimony] cannot simply rely on their expert's assurances that she has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required."[19] Here, Plaintiff cannot sustain her burden to demonstrate the admissibility of Dr. Ryan's proffered expert testimony.

---

[13] *Id.*; *see also Moore v. Ashland Chemical, Inc.*, 151 F.3d at 275-76.

[14] *See Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 590).

[15] *See id.*

[16] *Kerlec v. E-Z Serve Convenience Stores, Inc.*, No. 97-2577, 1998 WL 637244, at *1 (E.D. La. Sept. 16, 1998).

[17] *See Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 515 (E.D. La. 2002).

[18] *Moore v. Ashland Chemical, Inc.*, 151 F.3d at 275-76.

[19] *United Fire Grp. v. Duro-Last, Inc.*, No. 05-1499, 2006 WL 5086616, at *3 (E.D. La. Sept. 21, 2006).

## III.     ARGUMENT

The Court should exclude or limit the expert testimony of Dr. Ryan because she opines on wholly irrelevant matters, provides unreliable opinion testimony that relies on outdated and inaccurate information which contradicts contemporary sources, and is fundamentally unsupported and highly speculative.

### A.     Dr. Ryan Should be Prevented from Offering Testimony or Opinion on Irrelevant Matters Included in Her Report

To begin, the Court should prohibit Dr. Ryan from testifying about facts and issues which are not relevant in this case—specifically the mental health and/or emotional well-being of Plaintiff's parents, Dillard and Carla McCoy, Plaintiff's ███████████████, and Plaintiff's friend, ██████. An expert's testimony must "assist the trier of fact to understand the evidence or to determine a *fact in issue*."[20]  Dr. Ryan should be prohibited from testifying about these topics because the mental health and/or emotional well-being of Plaintiff's family and friend are not facts at issue in this case, as neither Dillard McCoy, Carla McCoy, ███████████, or ██████████ are parties to the instant litigation, nor can any of them seek damages for emotional distress.[21]

Throughout her report, Dr. Ryan repeatedly makes reference to the mental health of non-parties.  For example, she describes that Plaintiff's "mother began to experience depressive symptoms during Mary Claire's senior year and is treated with fluoxetine."[22]  She also describes Dillard McCoy's preoccupation with the events that transpired during the 2017-2018 school year,

---

[20] *Kerlec*, 1998 WL 637244, at *1 (emphasis added).

[21] The Court recently denied a Motion to Compel Dillard and Carla McCoy to produce certain information, R. Doc. 119, which Dillard and Carla McCoy opposed on the basis that they are third parties to this litigation and thereby protected from unduly burdensome and disproportionate discovery requests, *see* Opposition to R. Doc. 106.

[22] *See* Exhibit A at p. 9.

which "interfered in a variety of ways including work and family relationships."[23] Dr. Ryan goes on to recount the experience of ███████████, stating:

> ███████ reported that he became increasingly anxious and depressed as he witnessed what his sister was subjected to . . . he described sadness, decreased sleep, decreased concentration, decreased pleasure in previously pleasurable activities, and decreased energy, which was highly distressing and compromised his academic functioning. His description of his symptoms indicates that he experienced a major depressive episode. He also acknowledged contemplating suicide, but never acted on it.[24]

Finally, Dr. Ryan discussed how the "harassment" that Plaintiff's close friend, █████████, experienced as a result of her friendship with Plaintiff "followed her to Tulane where she is currently a student."[25]

Federal Rule of Evidence 404 establishes the test for relevant evidence. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Testimony about the mental and emotional well-being of Plaintiff's family and friend is not relevant because those facts are not of consequence in this action. Only *Plaintiff's* mental and emotional well-being is of consequence in this action, as only *Plaintiff* has asserted a claim for emotional distress damages. The Court should prohibit Dr. Ryan from testifying about irrelevant topics, specifically the mental health and/or emotional well-being of Plaintiff's parents, Dillard and Carla McCoy, Plaintiff's █████████████████, and Plaintiff's friend, █████████.

---

[23] *See* Exhibit A at p. 20.

[24] *See* Exhibit A at p. 25.

[25] *See* Exhibit A at p. 28.

**B.      Dr. Ryan's Expert Opinion Testimony Should Be Excluded As Unreliable Because She Utilizes Outdated Information**

The Court should exclude certain portions of Dr. Ryan's opinion which are not based on reliable principals and methods, insofar as she relies on an outdated and obsolete version of the DSM, the DSM-III-R, and relies on an outdated chart.  Specifically, Dr. Ryan relies on a figure included in a 1995 article to opine that Plaintiff has not—and *will never*—recover from PTSD.[26]  However, the article in which that chart was included relies on the version of the DSM in place at the time the research was conducted—the DSM-III-R.  The DSM has been revised *twice* in the intervening time period, and the criteria for PTSD has changed in each update of the DSM, such that reliance on studies premised on the DSM-III-R is misplaced.[27]  Another Court within the Fifth Circuit has indicated that a medical expert's opinion which relies on an outdated version of the DSM is circumspect and refused to allow the testimony.[28]  Dr. Ryan's expert opinion that Plaintiff will suffer lifelong PTSD and Dr. Ryan's reliance on the chart contained in an article from 1995, should be excluded as unreliable because they are not based on reliable principles and methods, insofar as they contain incredibly outdated and obsolete information.

**C.      Dr. Ryan Fails to Appropriately Separate the ███████████ and the Subsequent Bullying Plaintiff Experienced at School**

Dr. Ryan's opinion that Plaintiff suffers from PTSD should also be excluded because it is not based on reliable principles and methods, insofar as Dr. Ryan conflates Plaintiff's supposedly traumatic experience ███████████████ ██████████ on December 27, 2016, with the

---

[26] *See* Exhibit A at p. 33.

[27] *Compare* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (5th ed. 2013) *with* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, (3rd ed., revised, 1987).

[28] *See Mackey v. Children's Med. Ctr. of Dallas*, No. 3-05-CV-43-L, 2006 WL 8437268, at *2 (N.D. Tex. Apr. 4, 2006).

alleged harassment and bullying Plaintiff experienced at school and mostly outside of school at the hands of parents according to Plaintiff's own sworn testimony approximately one year to eighteen-months later.[29] The criteria for PTSD in the DSM-5, on which Dr. Ryan relies, defines a "traumatic experience" as "exposure to actual or threatened death, serious injury, or sexual violence."[30] In her report, Dr. Ryan opines that Plaintiff "experienced sexual violence in the form ████████████ ██████."[31] However, Dr. Ryan goes on to describe that Plaintiff "was repeatedly and chronically harassed" and suggests this harassment (which is tantamount to adolescent bullying) "was . . . traumatizing in and of itself."[32] However, pursuant to the diagnosis directives outlined in the DSM-5, this subsequent harassment is not sufficient to serve as a "traumatic experience," by definition. Dr. Ryan further makes no attempt whatsoever to differentiate the alleged harm Plaintiff actually suffered at school in settings and by persons under Newman's control versus that she allegedly suffered by the hands of parents and others in the community as well as off campus.

In fact, contemporary scholarly sources have expressly rejected the notion that harassment—and even sexually based harassment—as a youth is sufficient to constitute a "trauma" for purposes of PTSD. For example, one source explains:

> Commonly used threshold criteria for a PTSD diagnosis require that the trauma must be quite severe, involving actual or threatened death or serious injury or a threat to the physical integrity of the child, and that the response to the threat must be extreme, involving intense fear, helplessness, or horror. Given these threshold criteria and the pervasiveness of sexually harassing behaviors in everyday

---

[29] *See* Exhibit B at 44:18-48:1 (discussing parents who harassed or bullied Plaintiff during her senior year).

[30] American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (5th ed. 2013).

[31] *See* Exhibit A at p. 29.

[32] *See* Exhibit A at p. 29.

adolescent life, **it would likely be rare that a diagnosis of PTSD would be appropriate in a peer sexual harassment case**.[33]

Similarly, another source notes that "sexual harassment in school, although distressing, might not qualify as a severe enough trauma to cause PTSD."[34]

Dr. Ryan should be prohibited from opining that Plaintiff suffered PTSD as a result of the alleged harassment she experienced at school or that her PTSD was amplified by that harassment because such an opinion is not based on reliable principles and methods. In fact, that opinion is expressly repudiated in contemporary scholarly literature. Moreover, given the low probative value of Dr. Ryan's opinion that the harassment Plaintiff experienced at school caused and/or amplified her PTSD, this opinion is more prejudicial than probative. In fact, the only possible cause of Plaintiff's supposed PTSD, as defined in the DSM-5, ███████████ purportedly experienced at the hands of ███████ in her parents' home. Dr. Ryan should be prohibited from offering this unreliable testimony which will only confuse the jury.

**D.    Dr. Ryan Should Be Precluded from Offering Nonsensical Opinions and Opinions Which Are Unsupported and Contradicted by the Evidence in This Case**

Notwithstanding that the Plaintiff is 21 years old, on the Dean's List at a top art school in the country, scheduled to timely graduate from SCAD, and considering obtaining a graduate degree, Dr. Ryan nonsensically concludes that Plaintiff will experience "*continued* work-related difficulties secondary to PTSD and depression, including irritability, anger, and avoidance."[35] Dr.

---

[33] Praveen Kambam & Elissa P. Benedek, PRINCIPLES AND PRACTICE OF CHILD AND ADOLESCENT FORENSIC MENTAL HEALTH, *Clinical and Forensic Aspects of Sexual Harassment in School-Age Children and Adolescents* (Elissa P. Benedek, et al. eds., 2009).

[34] Melvin J. Guyer, Diane H. Schetky, & Peter Ash, M. PRINCIPLES AND PRACTICE OF CHILD AND ADOLESCENT FORENSIC MENTAL HEALTH, *Civil Litigation and Psychic Trauma* (Elissa P. Benedek, et al. eds., 2009).

[35] *See* Exhibit A at p. 33; Exhibit B at 58:2-11; 62:13-63:7; 66:13-67:2.

Ryan should be prohibited from offering nonsensical opinions which will only confuse the jury and which are more prejudicial than probative, because of their low probative value. The Fifth Circuit has instructed: "If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. Furthermore, its lack of reliable support may render it more prejudicial than probative, making it inadmissible under Fed. R. Evid. 403."[36] The Fifth Circuit has explained further: "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible."[37] According to the Fifth Circuit, "[w]hen an expert's testimony is 'not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's position],' the trial court should exclude it."[38] It is not enough for the proponent of the expert testimony to insist that the expert's opinion is based on "objective evidence," when it is clear that "the expert testimony in fact provides no basis of an award for damages without engaging in, not merely speculation, but unfounded speculation."[39] The aim of the Court's function as a gatekeeper is to "exclude expert testimony based merely on subjective belief or unsupported speculation."[40]

### i. Dr. Ryan's Opinion is Speculative, Lacks Factual Basis, and Completely Fails to Consider the Contemporaneous Notes of Plaintiff's Treating Psychologists ████████████████████████.

Dr. Ryan's opinion concerning Plaintiff's diagnosis as a result of the December 27, 2016 ████████████ and alleged harassment afterwards is unreliable, entirely speculative, and based on "altered facts" because it critically fails to consider the records and testimony of Plaintiff's treating

---

[36] *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

[37] *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 515 (5th Cir. 2013) (quoting *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007)).

[38] *Id.* (quoting *Guillory v. Domtar Indus.*, 95 F.3d 1320, 1331 (5th Cir. 1996)).

[39] *Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 281 n.4 (5th Cir. 2000) (citations omitted).

[40] *Gilmore v. WWL-TV, Inc.*, No. CIV.A. 01-3606, 2002 WL 31819135, at *5 (E.D. La. Dec. 12, 2002).

psychologists, Dr. Kelly Bolger and Dr. Michael Major, who treated Plaintiff while she was in high school prior to, during, and ███████████. In fact, Dr. Ryan brushes aside the records of Dr. Michael as "difficult to read," despite the fact that he treated Plaintiff for over a year prior to the incident and for more than a year following the incident and in fact treated Plaintiff during an appointment two days after the incident.[41] Moreover, Dr. Ryan completely fails to mention that Plaintiff also treated with Dr. Bolger, a psychologist who treated Plaintiff in 2015, prior to Dr. Major, related to Plaintiff's report of anxiety and depression from an earlier bullying incident during her freshman year at Newman. Dr. Ryan made no attempt to interview or speak with either Dr. Major or Dr. Bolger in preparing her report.[42]

The contemporaneous records of Plaintiff's treating mental health providers reveal that Plaintiff experienced nearly all of the same symptoms prior to and after the incident. During his deposition, Dr. Major explained that Plaintiff has experienced symptoms of anxiety, depression, suicidal thoughts, psychosis including paranoia and disassociation, dependent and borderline personality disorder, sleep disorder, attention deficit disorder, and others since her freshman year of high school.[43] Dr. Major testified that Plaintiff was prescribed various drugs during her Freshman and Sophomore years, including Lamictal, Lexapro, Xanax, Viibryd, Prozac, Remeron, and Cymbalta,[44] and that Plaintiff regularly exhibited drug compliance issues when she abused Xanax for parties and when she failed to take her medication for her complex seizure disorder.[45]

---

[41] *See* Exhibit A at p. 7.

[42] *See* Exhibit A at p. 1-2, 7 (noting sources on which Dr. Ryan relied in forming her opinion).

[43] *See* Exhibit C at 71:3-5 (discussing paranoia); 90:5-20 (discussing anxiety, depression, trouble sleeping, upset stomach, scratching behavior, personality disorder traits, and anger); 112:9-20 (discussing suicidal thoughts);

[44] *See* Exhibit C at 63:9-66:6.

[45] *See* Exhibit C at 57:18-20 ("[T]here were lots of times she would have a seizure because she would stop taking her medication."); 69:14-15 ("Certainly she would drink alcohol and take Xanax.").

PD.35029858.2

According to Dr. Major, Plaintiff both regularly consumed alcohol to self-medicate and smoked marijuana for many months prior to the incident.[46]

The records of Dr. Major also demonstrate that Plaintiff did not experience trauma symptoms, which are required for the diagnosis of PTSD, █████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████ Dr. Major testified that, during that session, Plaintiff repeatedly referred to the _____ as "hooking up" with █████ and that she was much more distressed at upsetting ████████████, ████████, who ██████████ ████████ at the time.[47]

Later on, when discussing _____, Plaintiff actually told Dr. Major that she didn't think there was any trauma associated _____ — Dr. Major counselled Plaintiff that the biggest stressors in her life throughout her senior year were ████████████ who was running a campaign against ███████ and Plaintiff's alcohol consumption.[49] Plaintiff actually expressed to Dr. Major that she just wanted to move on; however, her father was pressuring her to go forward with the lawsuit and it was causing her stress.[50] Moreover, Dr. Major testified that he "did not notice a significant change in [Plaintiff's] behavior or her emotional well-being" in the Fall semester of her senior year and that Plaintiff "was feeling better" during the Spring semester of her senior year.[51]

---

[46] *See* Exhibit C at 101:13-14 (describing that Plaintiff's marijuana usage "waxed and waned from heavy usage to *daily usage*"); 102:10-16 (describing Plaintiff's alcohol habit and noting, "Sometimes it was heavy, sometimes *it was nightly on*.").

[47] *See* Exhibit C at 157:1-158:9.

[48] *See* Exhibit C at 160:3-11 ("I agree there wasn't any trauma . . . No I don't think there was any trauma.").

[49] *See* Exhibit C at 112:17-20 ("[Y]our two Achilles heels' [sic] are, alcohol and ██████ are not your friends. That one is a hard one, right, because you lose a lot of control over your emotional regulation.").

[50] *See* Exhibit C at 160:3-4 ("I'm tired, I don't care, I don't want a lawsuit, I am tired."); 248:18-20 (referring to the lawsuit and stating "she thought this was way over the top and she wanted no part of it").

[51] *See* Exhibit C at 266:11-15.

Plaintiff's grades prove so as well—she went onto earn the highest GPA her senior year and get into her first choice school with a partial scholarship.[52]

Dr. Ryan's complete failure to consider the contemporaneous medical record of Plaintiff's first treating mental health provider, Dr. Bolger, and her longstanding psychologist who treated her just days following the incident, Dr. Major, demonstrates that Dr. Ryan's opinion "is 'not based upon the facts in the record but on altered facts and speculation designed to bolster'" her position.[53] It is clear that Dr. Ryan's expert opinion provides no basis for an award of damages because it is based on unfounded speculation. As such, her opinion should be excluded as unreliable and unhelpful to the jury.

>       ii.    **Dr. Ryan Should Be Precluded from Opining that Plaintiff Will Require Treatment for PTSD for the Remainder of Her Life**

Dr. Ryan opines that Plaintiff will continue to require treatment for her PTSD for the remainder of her life and that "her symptomology is likely to persist indefinitely."[54] However, this opinion is "fundamentally unsupported" and is illogical. To begin, the opinion is unsupported because none of Plaintiff's *treating* mental health providers anticipate that she will require treatment for PTSD for the remainder of her life. As such, this opinion of Dr. Ryan is not based on facts in the record but is instead impermissibly based on speculation. Further, Dr. Ryan's opinion that Plaintiff's symptoms of PTSD will persist indefinitely, even with treatment, is illogical and contravenes the entire purpose of treatment: to make a patient better. Dr. Ryan's conclusion is nonsensical because—if Plaintiff will never get better—then treatment is useless.

---

[52] *See* Exhibit B at 56:18-23 (discussing partial scholarship); Exhibit D (Newman transcript).

[53] *Moore v. Int'l Paint, LLC*, 547 F. App'x at 515 (quoting *Guillory*, 95 F.3d at 1331).

[54] *See* Exhibit A at p. 32.

14

Moreover, as described above, the sources cited by Dr. Ryan for her opinion that Plaintiff will require indefinite treatment are outdated and unreliable. Another court within the Fifth Circuit has recently excluded an expert's unsupported opinion that plaintiffs who suffered from PTSD would require three to five years of future treatment, concluding, "the opinion as to the length of treatment necessary (and the attendant cost of such treatment) lacks any basis in evidence and is nothing more a random speculative assessment."[55]  Dr. Ryan should similarly be prohibited from offering unsupported, unhelpful and confusing testimony that Plaintiff will require lifetime treatment for her PTSD and that "her symptomology is likely to persist indefinitely."

### iii.    Dr. Ryan Should Be Precluded from Opining that Plaintiff Will "Continue" To Experience Work-Related Difficulties

Dr. Ryan's opinion that Plaintiff will "continue" to suffer work related difficulties is similarly "fundamentally unsupported," and therefore unhelpful and more prejudicial than probative.  Dr. Ryan recounts that Plaintiff will experience "*continued* work-related difficulties secondary to PTSD and depression, including irritability, anger, and avoidance."[56]  However, Dr. Ryan fails to note any *present* work-related difficulties that Plaintiff has experienced.  In fact, Dr. Ryan relates that Plaintiff worked at an art museum in Savannah this past summer and does not report any job-related difficulties associated with that position.[57]  Plaintiff's deposition testimony confirms that Plaintiff is currently a successful college student who has made the Dean's List "every quarter" since her Sophomore year while simultaneously working 10-15 hours per week as a docent at an art museum and volunteering approximately 10 hours per week for a student-run

---

[55] *Hamilton v. McLemore*, No. 2:19-CV-47-KS-MTP, 2021 WL 1654008, at *4 (S.D. Miss. Mar. 18, 2021).

[56] *See* Exhibit A at p. 33.

[57] *See* Exhibit A at p. 12.

magazine.[58]  Plaintiff is also optimistic about receiving an internship in Atlanta, GA with a professional who does retouching for major magazines and has also contacted the New York Post about a potential internship opportunity.[59] Moreover, Plaintiff testified that her career goal is to be a band photographer in New York[60] and is <u>currently</u> acting as a band photographer for her friends' band, Basterdane, which has released two singles and has found an agent to manage them in New York.[61]  She further testified during her deposition that "I do band photography a lot."[62]

Plaintiff's deposition testimony reflects that she has performed well at every job or position she has had to date.  Dr. Ryan's opinion about Plaintiff's "continued" work-related difficulties is not based on the facts in the record and, instead, is premised on "altered facts and speculation designed to bolster" Plaintiff's position.[63]  As the Fifth Circuit has recognized, "expert testimony that relies on 'completely unsubstantiated factual assertions' is inadmissible."[64]  In fact, the Magistrate Judge in this case has recognized the inherently speculative nature of Plaintiff's future occupational performance, noting, "[t]he income tax returns of a student (whether high school or college) are not probative of anything in this case, including Plaintiff's claim for future wage loss and/or diminution of earning capacity."[65]  Because Dr. Ryan's opinion that Plaintiff will continue to experience work-related difficulties is wholly unsupported and inherently speculative, it is also

---

[58] *See* Exhibit B at 58:2-11; 62:13-63:7;  66:13-67:2.

[59] Exhibit B at 67:17-22 (discussing the internship and noting, "So that will eventually happen."); 68:14-69:9.

[60] Exhibit B at 64:22-23 ('I mean, the dream is to be a band photographer.").

[61] Exhibit B at 65:17-66:12.

[62] Exhibit B at 61:17-62:10.

[63] *Moore v. Int'l Paint, LLC*, 547 F. App'x at 515 (quoting *Guillory*, 95 F.3d at 1331).

[64] *Id.* (quoting *Hathaway*, 507 F.3d at 318).

[65] R. Doc. 119.

unhelpful to a jury and more prejudicial than probative.[66] Dr. Ryan should be prohibited from offering such an opinion.

### iv. Dr. Ryan Should Be Precluded from Opining that Plaintiff Will Require Inpatient Treatment at Some Point in Her Life

Dr. Ryan should be prohibited from offering the wholly unsupported and inherently speculative opinion that Plaintiff will require "treatment in a dual diagnosis residential treatment facility specializing in trauma and alcohol abuse for 30 to 90 days, with step down to an intensive outpatient program for 6 to 8 weeks."[67] Dr. Ryan, a non-treating "expert," offers no foundation for this opinion, which is purely rank speculation. In fact, this opinion is undermined by the records from Plaintiff's mental health providers that do not indicate that Plaintiff would require such treatment. In fact, during the deposition of Dr. Michael Major, Plaintiff's treating mental health provider from May 2015 to April 2018 (a month before Plaintiff's graduation), Dr. Major affirmatively denied that he ever recommended inpatient treatment for Plaintiff.[68] The opinion of Dr. Ryan that Plaintiff will require 30 to 90 days of inpatient treatment at some point in the indefinite future after the Plaintiff has had a successful academic career at a top-ranked art school, is "not based upon the facts in the record but on altered facts and speculation designed to bolster [a party's position]." [69] As such, the Court should prevent Dr. Ryan from offering this opinion.

### E. Dr. Ryan Should be Prohibited from Testifying on Conclusions She Did Not Make to a Reasonable Degree of Medical Certainty

Dr. Ryan should be prohibited from offering opinions for which there is no reasonable degree of medical certainty. Specifically, Dr. Ryan suggests that Plaintiff "has experienced

---

[66] *See Viterbo,* 826 F.2d at 422.

[67] *See* Exhibit A at p. 34.

[68] *See* Exhibit C at 264:14-21.

[69] *Moore v. Int'l Paint, LLC,* 547 F. App'x at 515 (quoting *Guillory,* 95 F.3d at 1331).

symptomatology compatible with Obsessive Compulsive Disorder (OCD)."[70] However, Dr. Ryan does not actually diagnose Plaintiff with OCD and does not opine, to a reasonable degree of medical certainty, that Plaintiff has OCD. As such, this testimony is unhelpful to a jury and is unreliable. It should be excluded as such.

## IV.    CONCLUSION

Newman requests that the Court exclude or limit the unreliable testimony of Plaintiff's psychiatric expert, Dr. Eileen Ryan. Dr. Ryan should be prohibited from offering testimony or opinion on wholly irrelevant matters, including the mental health and emotional well-being of non-parties to this action. Dr. Ryan's should also be prohibited from offering testimony or opinion that is unreliable and relies on outdated and obsolete diagnostic information and scholarly sources. Moreover, Dr. Ryan should be prohibited from offering testimony or opinion on matters which are fundamentally unsupported, including that Plaintiff will require treatment for PTSD for the remainder of her life, that Plaintiff will *continue* to suffer work-related difficulties, and that Plaintiff will require inpatient treatment at some unknown point in the future.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:     */s/ Harry Rosenberg*
HARRY ROSENBERG (#11465)
KIM M. BOYLE (#18133)
REBECCA SHA (#35317)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
E-mail:   harry.rosenberg@phelps.com
kim.boyle@phelps.com

---

[70] *See* Exhibit A at p. 31.

18

rebecca.sha@phelps.com

**ATTORNEYS FOR DEFENDANT, ISIDORE
NEWMAN SCHOOL**

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on this 24th day of August, 2021 a copy of the foregoing sealed

pleading was securely emailed to the email address listed in the Court's March 20, 2020 Notice

Regarding Sealed Pleadings and Facsimile Filing of Paper Documents and a copy of said filing

was served via e-mail upon all counsel of record.

<div align="right"><em>/s/ Harry Rosenberg</em></div>



**THE OHIO STATE UNIVERSITY**
WEXNER MEDICAL CENTER

**Eileen P. Ryan, D.O.**
Vice Chair of Clinical Services
Professor of Psychiatry and
Behavioral Health
OSU Harding Hospital
1670 Upham Drive Suite 130
Columbus, OH 43210-1250
Phone (614) 685-5602
Fax (614) 293-4900
E-mail eileen.ryan@osumc.edu

June 30, 2021

Monica H. Beck, Esq.
Fierberg National Law Group, PLLC.
161 East Front Street
Suite 200
Traverse City, MI 49684
Phone: (231) 933-0180
Fax: (231) 252-8100
mbeck@tfnlgroup.com

*Mary Claire L. McCoy v Isidore Newman School;* ███████████
██████████████████████
Civil No. 19-cv-01810

Dear Ms. Beck

As per your request, I have reviewed records and documents pertaining to the above-referenced case and have conducted a forensic mental health evaluation of Mary Claire McCoy, currently a 21-year-old woman and student at the Savannah College of Art and Design (SCAD) in Savannah Georgia. ████████████ ████████████████, in December 2016 when she was a junior high school student at Isidore Newman School; at that time she was 17.2 years old. The █████ came to the school's attention approximately 10 months later. ██████ ██████████ ████████████████████████

You have requested my opinion as to whether Mary Claire McCoy suffered emotional damage secondary ████████████ and the subsequent events that transpired at Isidore Newman School.

In forming my opinion, I relied on information from the following sources:
1. Face-to-face evaluations of Mary Claire McCoy by Zoom by Dr. Eileen Ryan on June 3, 2021 and June 18, 2021
2. Telephone interview/evaluation of Mary Claire McCoy by Dr. Eileen Ryan on June 11, 2021 and June 27, 20121

**EXHIBIT**

**A**

3. Telephone interview with Carla McCoy, Mary Claire's mother, by Dr. Eileen Ryan on June 15, 2021
4. Telephone interview with W. Dillard McCoy, Mary Claire's father, by Dr. Eileen Ryan on June 15, 2021, June 16, 2021, and June 28, 2021
5. Telephone interview with ███████████y, Mary Claire's twin brother, by Dr. Eileen Ryan on June 16, 2021 and June 27, 2021
6. Telephone interview with ██████, Mary Claire's best friend at Isidore Newman by Dr. Eileen Ryan on June 25, 2021 and June 27, 2021
7. Telephone interview with Dr. Serena Chaudry, Mary Claire McCoy's therapist, on June 24, 2021
8. Second Supplemental and Amending Complaint and Jury Demand, filed July 1, 2019 Under Seal (Complaint)
9. Protective Order Filed Under Seal, dated February 11, 2020
10. Report of Investigation by Investigator Lisa Karen Atkins of Ogletree, Deakins, Nash, Smoak & Stewart, PC, dated December 15, 2017, which includes interviews, emails, text messages, etc.
11. Educational Records of Mary Claire McCoy from 4th through 12th grades (2009—2018)
12. Confidential Memorandum from Dale M. Smith, Head of School to Sabrina Pilant, Director of Advancement, dated January 22, 2019
13. Medical and therapy records of Mary Claire McCoy:
    a. Hales Pediatrics (7/30/2016-10/25/2017)
    b. Michael J. Major
    c. Ochsner Health System
    d. Integrated Pain and Neuroscience—Andrea O'Leary, MD
    e. Savannah Psychiatry
    f. Tulane Doctors
    g. Psychological evaluation by M. Patricia Brockman, Ph.D., dated August 15—October 5, 2016
14. The Isidore Newman School website:  https://www.newmanschool.org/
15. The Newman Handbook

At the beginning of this evaluation, Mary Claire McCoy was informed of the nature, scope and purpose of the evaluation, including the relevant limits of confidentiality.  She cooperated fully with the examination and gave consent for me to contact others who may be able to provide relevant information.

**Relevant Background Information**

The Complaint provided to me documents the history of events as they transpired, and these events were also described by Mary Claire McCoy, her parents, ███████████, and ███ during interviews for this evaluation and will be discussed in more detail in the body of this report.  Briefly, in order to provide context for events and consequences that will be described, the following timeline of events is offered:

---

[1] In this report, students other than ███████████ and ███████████ ███ will be referred to by their initials.



- Newman administrators reportedly informed Mary Claire's parents that:
  1. ███████████████████████████████
  2. ███████████████████████████████
  3. Newman's protocol was to conduct an independent evaluation and urged that the McCoys keep the matter, including the investigation, confidential
  4. Mary Claire's identity would be kept confidential, and Newman would not identify Mary Claire as the accuser to ███████ or his parents
- Newman School engaged the services of Lisa Karen Atkins (from Ogletree, Deakins, Nash, Smoak, & Stewart, P.C. in Birmingham, Alabama) to conduct the evaluation.
- ███████ was withheld from school in early November pending the results of the independent investigation.
- Almost immediately after the initiation of the investigation and ███████ absence from school, the McCoys began to receive phone calls from parents demanding to know details surrounding ███████ and expressing the opinion that the investigation of ███████ would be "bad" for ███, the senior class, and/or the school, and demanding that the McCoys stop the investigation. The father of ███████ contacted Mr. McCoy indicating that Newman officials had told him that if the families resolved the matter between them that Newman would call a halt to the investigation.
- Mary Claire McCoy was subjected harassment, humiliation, derision, and isolation by Newman students beginning in November 2017 and continuing throughout the school year, which included, but was not limited to, the distribution of "███████████" propaganda distributed in school and on school grounds.
- Despite numerous complaints regarding the harassment of Mary Claire to Newman administration, Mary Claire's harassers were neither reined in nor received consequences.
- Ms. Atkins conducted the investigation, relying on the standards and requirements set forth in The Newman Handbook, and quoted heavily from it in the investigative report.

Ms. Atkins interviewed numerous students, Newman employees, and Mary Claire McCoy and ███████, as well as reviewed emails and text messages, and ████ ████ lie detector test.

- Throughout the investigation, the McCoys were besieged with questions and urgings by parents, some subtle, some direct and coercive, to call off the investigation and resolve the situation with the ████ informally.

- The McCoys abided by their promise to Newman School officials to not disclose



- Newman was made aware of the misconduct against Mary Claire McCoy on numerous occasions by numerous individuals.

- Newman received threats from influential parents that financial support of Newman would be discontinued if Newman did not revisit its decision regarding ████████ They provided information that indicated that they were provided details of the independent evaluation.

- The McCoys met with Head of School Dale Smith and Chair of the Newman Board of Governors, Peter Sperling, in order to discuss how to assist Mary Claire given the continued harassment at school. At that meeting, they were reportedly told that Newman was going to re-visit the independent investigation unless the McCoys agreed to mediate with the ████ family. The McCoys were not provided a copy of the report of the independent evaluation.

- Newman School retained an attorney, an alumnus of Newman, to review the Independent Investigation, and subsequently announced their decision to invalidate the findings and

conclusions of the independent investigation they had commissioned in November and that a new investigation would be necessary.
- Mary Claire and her parents agreed to a second investigation.
- A second investigation was not conducted.
- In April 2018, Head of School Dale Smith sent a letter to ███████ and his family ensuring that ███████ would receive a Newman diploma (despite matriculating at a local public school for the second semester of his senior year) and would be considered an alumnus of Isidore Newman School.
- A Confidential Memorandum, dated January 22, 2019, from Head of School Dale Smith to Sabrina Pilant, Director of Admissions, directs Ms. Pilant to designate ███████ as *Alumni Not Graduated*, entitling him to receive alumni mailings, as well as communication regarding "reunions and gatherings for the Class of 2018."

## Social Developmental History
Mary Claire McCoy was born on October 21, 1999 to married parents in New Orleans, Louisiana. Her mother, Carla McCoy, had a normal pregnancy, and an induced vaginal delivery a couple of weeks early given the fact that she was carrying twins. She denied any developmental delays. Mary Claire's mother reported that Mary Claire received some occupational therapy for "sensory issues," specifically a hypersensitivity to sound, between the ages of 2 and 3. She recalled that loud sounds would cause Mary Claire to put her hands over her ears, and sometimes cry if the sounds were "really loud."

Mary Claire has an older brother, age 26, and a twin brother, ██████, who is currently a college student in Tennessee. She described her parents as "great parents," and recalls them as being "open minded" and not pushing their political beliefs on their children, and not "obsessed" with the activities that many of her friends' parents were, such as debutante balls, money, and social status.

## Educational History
Mary Claire McCoy was a legacy student at Isidore Newman School. Her paternal grandmother, father, and older brother attended Isidore Newman School (as did her twin brother). She attended the school from pre-kindergarten through 12th grade.

Transcripts reviewed indicate that Mary Claire was an average student at Isidore Newman School. Final grades typically were in the "B" range with a smattering of As and Cs. Her final cumulative high school GPA was 2.9. Relative weaknesses appear to be in math and sciences with strengths noted in creative/artistic pursuits (film and photography) and English. A review of teachers' comments throughout the years reveals several references to shyness and a lack of confidence.

ACT composite score in October 2017 was 26, placing her in the 90th percentile[2] overall with scores varying from 21 in science to 31 in reading.

---

[2] Scoring in the 90th percentile means that 90% of students received that score or lower.

Absence Analysis Detail records from August 1, 2016 to May 3, 2018 were reviewed and reveal a significant increase in tardies and absences during her senior year. Not counting absences for sporting events, college visits, and field trips, there were over 140 absences or tardies for the 2017-2018 academic year.  By contrast there were 45 tardies or absences during her 9th grade year (2014-2015); 71 tardies or absences during her 10th grade year (2015-2016); and 61 tardies or absences during 11th grade.[3]

As previously noted, Mary Claire will be a senior at SCAD in the fall of 2021 and is on track to graduate in the spring of 2022.[4]

*Medical History*
Mary Claire's parents endorsed a longstanding history of shyness which escalated in 8th or 9th grade.  Although Mary Claire endorsed symptoms compatible with clinical depression in 9th grade, her parents reported that they attributed her difficulties to shyness and the fact that she and her brother were being bullied.  Anxiety manifested as abdominal pain and discomfort, resulting in feeling sick when she ate, feeling like her "stomach was in knots," and weight loss. According to her mother her symptoms improved considerably with treatment, but recurred again during her senior year.

Medical history is also notable for a complex partial seizure disorder for which Mary Claire is treated with the anticonvulsant medication lamotrigine (Lamictal).  Records reviewed indicate that seizures began around 2005, and her mother has a history of similar seizures.  The record indicates that the seizure focus is in the mesial temporal area.  The last note received is dated December 12, 2019, at which time she was taking 200 mg daily of Lamictal. The record indicates that she sometimes had breakthrough seizures related to missing Lamictal doses.  Mary Claire reported in an interview for this evaluation that her last seizure was 2 months ago when she was running low on medication and did not have a refill, as her neurologist had left the practice.  Mary Claire stated that she has increased seizure frequency with stress.  She also related that other contributing factors for the two seizures she experienced 2 months ago were the death of a cousin and her attorney "filling me in on what was said about me in some depositions."

Mary Claire related that she had avoided being present ("getting on the call") for the depositions secondary to wanting to avoid what she perceived to be the inevitable increase in PTSD symptomatology, anger, depression, and anxiety that would result.  After hearing about what was said at the depositions (including what was related in a deposition of a guidance counselor, Mimi Ryan, who she was very close to at Newman) she experienced an increase in "bawling" and crying, estimating that she experiences crying about three times weekly.  She stated, "I didn't want to believe or think about that; I was not in the head space to do that."

---

[3] Many of the tardies and absences both years were excused according to the records reviewed, noting illness and appointments; however, the increase during her senior year at Isidore Newman is significant.
[4] A copy of Mary Claire's transcript from SCAD has been requested, but was not yet available at the time of this report's preparation.

A psychological evaluation completed by M. Patricia Brockman, Ph.D. from August to October 2016 (███████████████████) in order to "ensure ongoing accommodations to address her learning needs in her high school and college programs, especially for exams and high stakes testing." The background information in the report includes Mary Claire's history of complex partial seizures as well as the fact that she was taking fluoxetine (Prozac) to address depression and anxiety. Dr. Brockman's states in her report that "the most remarkable observation during the testing was her lack of confidence and hesitation when responding. She tended to second guess herself even on the cognitive and learning tasks where she was successful." Her Full-Scale IQ score fell in the average range, with inconsistencies in her cognitive profile, notably slow processing speed and difficulty with auditory short-term memory, but high-average verbal reasoning abilities in the 75th percentile. Testing confirmed prior diagnoses as well as parent observations and history obtained from Mary Claire. Diagnoses in addition to the epilepsy-complex partial seizure disorder included generalized anxiety disorder, social anxiety disorder, dysthymic disorder (chronic depression), and attention deficit/hyperactivity disorder, combined type. A variety of accommodations and educational modifications were recommended.

Records from Michael Major, MP (a psychologist with prescribing privileges) whom she initially began seeing for therapy to address anxiety were reviewed. It appears that he saw her from May 2015 to April 2018. Most of the notes are difficult to read as they are handwritten process notes, but in a letter to her neurologist, he indicates that he was treating her for generalized anxiety and ADHD. Over the course of his treatment of her, she was prescribed a variety of medications including Vyvance and Adderall (for ADHD), sertraline (Zoloft), mirtazapine (Remeron), fluoxetine (Prozac), and duloxetine (Cymbalta), trazodone, aripiprazole (Abilify), alprazolam (Xanax), clonazepam (Klonopin), zolpidem (Ambien), and risperidone (Risperdal).

Psychiatric records of Mary Claire from Andrea O'Leary, MD from September 17, 2018 to September 2, 2020 were reviewed. The initial psychiatric evaluation on September 17, 2018 indicates that she was experiencing increased anxiety and poor sleep with poor appetite. The note indicates that she informed Dr. O'Leary that she was "sexually assaulted by her best friend's boyfriend while in high school." The record notes previous trials of Vilbryd (vilazodone), Cymbalta, Remeron, Abilify, risperidone, and Wellbutrin (bupropion). Diagnoses of PTSD, generalized anxiety disorder, and major depressive disorder are noted. Mary Claire described heavy use of alcohol over the summer, drinking four days a week. She was encouraged to abstain from alcohol. When seen again on October 17, 2018 Mary Claire had lost a prescription for Seroquel (quetiapine) to assist with sleep, and was continuing to drink on the weekends and sleep poorly. She also reported that she was getting behind in her classes and often took naps during the day. The note indicates "she is rather monotone and flat." She also admitted to low energy and procrastinating. She was noted to be compliant with the Lamictal and the Zoloft. The plan was to restart Seroquel 50-100 mg nightly for sleep and continue on the Seroquel 100 mg daily as well as Lamictal for her seizure disorder. The records indicate that Mary Claire experienced obsessive and ruminative thoughts████████████████. She was noted to have suffered from anxiety since the 9th grade, with a history of panic attacks, social phobia, and anxieties about being watched. PTSD symptomatology noted in the record includes a history of nightmares and flashbacks.

A note dated August 21, 2019 noted increased symptomatology when back home in New Orleans, with a variety of triggers. The most recent note received is dated September 2, 2020 and indicates that Mary Claire was started on the antidepressant venlafaxine (Effexor XR) 37.5 mg daily with a plan to increase gradually, and clonazepam 0.5 mg twice a day.

During this evaluation, Mary Claire reported that her current medication regimen includes Prozac 40 mg daily, Lamictal 200 mg daily (for seizure control), and Klonopin 0.5 mg as needed up to twice a day, and she continues to see Dr. O'Leary. Mary Claire noted that she has an increased need for Klonopin when she goes home to New Orleans.

Mary Claire indicated that she is currently engaged in trauma-focused cognitive behavioral therapy (CBT) with Dr. Chaudhry (whom she sees virtually as she is based in New Orleans), and has been in treatment with her since 12th grade. She had been seeing her every 2 weeks, but then increased the frequency to weekly secondary to an increase in depressive and anxious symptomatology.

Therapy notes by Serena Chaudhry, DSW, LCSW, MPH are dated from February 7, 2018 to March 25, 2021, but in a telephone interview for this evaluation, Dr. Chaudhry related that she continues to see Mary Claire weekly or every other week, and last saw her a week ago. There was a break in therapy when Mary Claire was at SCAD, but treatment resumed over the last year. The notes reflect that she has received "trauma focused psychotherapy for symptoms related to ███████████████████████ l." The last note reviewed dated March 25, 2021 indicates that she presented feeling "overwhelmed and triggered by recent sexual harassment" on campus. Mary Claire continues to receive the diagnoses of major depression, recurrent; generalized anxiety disorder; and PTSD.

Dr. Chaudhry related that although Mary Claire has made significant progress in therapy she continues to struggle with depression and anxiety with intermittent exacerbations, most recently this spring, likely related to increased activity around litigation. She recalled that when she began working with Mary Claire as a senior at Newman, she was suffering from "severe" depression and anxiety, and was experiencing panic attacks, increased seizure frequency, and PTSD related to being "ostracized" and "mistreated" at Newman. Dr. Chaudhry indicated that she did not begin seeing Mary Claire until ██████████████████████ was revealed, but related that she believes that the harassment that she received in the ████████████ was ███████████████████████████████████████. Dr. Chaudhry related that Mary Claire began using alcohol as a "way to escape," but "took responsibility" for the DUI and was actively engaged in the court-ordered group therapy, rather than just participating in it because it was court-ordered.[5] She described Mary Claire as a "courageous and communicative young woman." Dr. Chaudhry related that Mary Claire's trauma ████████████████ and "fall out" of it being revealed has affected her interpersonal relationships, especially intimate relationships, noting that Mary Claire has a "distain for men beyond her nuclear family" and uses alcohol "as a coping mechanism."

---

[5] Mary Claire received a DUI citation in October 2020. She was court ordered to attend group therapy and AA, which she has reportedly complied with.

Dr. Chaudhry was questioned about the recurrent answer "no" to questions regarding compliance with medication and treatment recommendations in her records. Dr. Chaudhry indicated that this was an erroneous carry-over related to the electronic health record, and not accurate. She stated that although Mary Claire had been noncompliant with medication (particularly her anticonvulsant) early on in treatment, this is not currently an issue, and she is responsible about attending therapy sessions and cancelling if she is unable to.

*Family Mental Health History*
Mary Claire related depression and anxiety in a cousin who reportedly died by accidental opioid overdose in February 2021, but it is unclear as to whether this was formally diagnosed or treated.

Mary Claire's mother began to experience depressive symptoms during Mary Claire's senior year and is treated with fluoxetine. By the report of both Mary Claire and her mother, there was no history of depression in her mother prior to the traumatic ███████████ ███ being reported at Isidore Newman. Mary Claire believes that her brother was also depressed, secondary to "losing a lot of friends" related to the school's response to Mary Claire and his defense of her. She related that she believes that her father is also depressed, in that he is "so angry."[6] She stated that her mother is "extremely depressed" and "hates going out in public" for fear of meeting one of the peers and/or their parents who vilified and harassed her ████ ████████████████████████

The interview of ████████████ for this evaluation revealed that he also likely experienced a clinical depression during his senior year at Newman School; however, he did not receive treatment and kept his distress to himself.

There is no other history of mental illness in the maternal or paternal extended families.

*Information Regarding* ████████
Information regarding the ████████ s well documented in the Complaint and in the interviews conducted during the independent investigation conducted in the fall of 2017, and Mary Claire's description during this evaluation is consistent with that. Briefly, she recalled walking from a party to her home with ████████████ and her twin brother, ████████████. Mary Claire recalled that at some point █████ and █████████ ended up walking in front, with her and █████ walking behind. ██████│███████████████████████ by Mary Claire's report, ██████████████████████████████████████████████████████████████████ the McCoy home, according to Mary Claire, ████████ and ███ the four of them went into Mary Claire's bedroom. ████████████ laid on the bed, and Mary Claire and ████████ were on the floor. Mary Claire recalled that she may have had one drink or a beer and was not intoxicated.

---

[6] When asked about depression, Mr. McCoy did not answer directly but indicated that he was preoccupied with his daughter's distress during her senior year and it significantly affected his functioning. My interview with Mr. McCoy was in the context of Mary Claire's evaluation, and therefore I did not pursue additional questioning.



sitting on the curb and asked him if he wanted to come inside and wait, to which he replied that he did not. ███████ and Mary Clare recalled that ███████ slept over that night, and Mary Claire told ███████████████████████████████████████████████████ much to say. Mary Claire recalled that she talked with ██████ about it the following day, but is unclear as to whether it was before or after ███████████████████████████████████████ ████████████████ ███████████ ██████████ ████████████████████ ████████████████████████████ ███████████████

Mary Claire and her brother ██████████ recall that she told ████████████ the evening ████████ ████████ and then told her mother the next day who subsequently called her father who was at work. Mary Claire told her brother and parents that she did not want ████████ to be made public, as she feared the repercussions, which ultimately came to pass.

*Independent Evaluation* ██████████████
The Report of Investigation, dated December 15, 2017, requested by Isidore Newman School, and conducted by Lisa Karen Atkins of the law firm of Ogletree, Deakins, Nash, Smoak, & Stewart, P.C. in Birmingham, Alabama fastidiously details the inquiry into ████████████ Mary Claire McCoy, and that information will not be repeated in this report. The report is 235 pages long and contains data obtained from numerous interviews including interviews of Newman staff, █████████, his friends, Mary Claire McCoy, her brother, and ███, as well as

copies of emails, text messages, medical records and information regarding the polygraph ███ took.



2. The polygraph that ██████ passed ██████ and asked him about an incident in January 2018 rather than December 2017 ██████ of Mary Claire

**Clinical Interview with Mary Claire McCoy and Mental Status Examination**

Mary Claire McCoy is a 21-year-old woman who appears her stated age. She was dressed casually but appropriately for the Zoom evaluations, wearing a small nose ring and horn rim glasses. Appearance is notable for a predominantly sad or bland facial expression, punctuated infrequently by wry grins, but never laughter or smiling. Speech was without evidence of pressure (sometimes observed in mania) or latency of response (sometimes observed in depression). Speech was halting at times, particularly when asked ██████ and the aftermath of its discovery at Isidore Newman School, and there were several times that her voice broke when describing the aftermath, but she composed herself and appeared to be doing her best to answer questions and provide relevant information. She was most tearful when discussing the aftermath of the revelation ██████, specifically her experiences in school and with schoolmates whom she had previously considered friends, as well as the response of their parents, which she reported that the school enabled. She described her mood as "anxious and depressed," noting that she considers the anxiety to be most disabling. Emotional tone (affect) was for the most part flat and constricted with evidence of distress and tearfulness particularly around descriptions ██████, her mental state ██████, the events that transpired and affected her after the abuse became revealed, and her current difficulties with functioning, particularly socially and sexually. Avoidance was frequently noted over the course of the interviews by her avoidance of providing specifics regarding the traumas, several times referring to them as "that whole situation" until specifically queried for details.

She denied any past or present psychotic symptomatology. Specifically, she denied any hallucinatory phenomena, and there was no evidence of delusional ideation. Although she used the term "paranoid," exploration of what she actually meant by this term indicated that she was referring to hypervigilance and anxiety related ██████ and its aftermath. She did endorse intense and intrusive thoughts, sometimes obsessive in nature, but there was no evidence of a thought disorder or illogical thinking. However, thought content was characterized by obsessive and ruminative thinking, which increases when under stress.

Mary Claire endorsed frequent passive death wishes in the form of thinking that if she is going to feel like this indefinitely or forever, "What's the point?" By her report the closest she came to suicide was in the 12th grade after having a couple of drinks on New Year's Eve and texting some of the students who had been harassing her with a statement to the effect, "You guys did this to me; you made me want to kill myself." By her report, at the time she was holding a knife to her throat, but the friends that she was with at the time got her to put the knife down. She reported thinking currently, "why do I want to be alive if my mind set is going to be like this forever?" However, she indicated that ultimately, she does not want to be dead as she is "scared of not existing." She denied homicidal ideation. Intelligence within the scope of this evaluation appears to be at least in the average range, with a good fund of knowledge. Insight and judgment are good, except when emotionally aroused particularly when experiencing an exacerbation of depression, anxiety, and or PTSD symptomatology.

Mary Claire currently resides in off-campus housing with two friends. She related that although she had always loved New Orleans and had imagined that she would marry and raise a family in New Orleans, the trauma she experienced particularly with respect to the aftermath of ████ ████, has caused her to have difficulty even visiting her family in New Orleans. For example, this summer she has a job at an art museum in Savannah and will be taking some classes; she avoids going home to New Orleans, noting "I definitely feel more agitated and on edge," and endorsed fears of running into ████████ and many of the people who harassed her after the ████ came to light. She endorsed increased depressive and anxious symptomatology when she is back home in New Orleans, and even holidays like Thanksgiving and Christmas, which she had always loved, have become difficult for her secondary to the increase in anxiety and PTSD symptomatology when she is home. She plans to move to Atlanta after graduation from college, noting that feels she can "never again" live in New Orleans, adding that although she still loves New Orleans, "I was just caught up in a terrible community."

Mary Claire endorsed anxiety "my whole life," with a significant increase ████████, and then again after ████████ was revealed and she began to experience harassment at school. She related that she has never gotten back to her baseline mood since the traumatic events experienced during her 12th grade year. Anxiety increased more recently in March or April of 2021 related to an increase in activities related to litigation. She acknowledged that her anxiety has been quite severe over the past couple of weeks related to anticipating meeting with me.

She recalled having depressive symptoms in the 9th grade, specifically feeling exhausted during the day and having an increased need for sleep. Presently she endorses variable sleep, sometimes sleeping too much, sometimes not getting enough sleep. She also endorsed appetite disturbance; decreased energy (always feeling sluggish or tired); and decreased enjoyment of previously enjoyable activities such as art, being at the beach, etc. She related that she tries to enjoy these activities but "I know I should be getting more out of them." She also endorsed decreased concentration and focus, which becomes more problematic with an increase in depressive and anxious symptomatology. She also related dissociative symptoms in the form of "zoning out" and "not knowing who I am talking to," most commonly with "stressful

conversations." Mary Claire noted that whenever she is in a conversation in which someone acknowledges they have been sexually harassed or assaulted, "I get overwhelmed pretty easily."

Mary Claire related that she has had some sensory hypersensitivities since childhood, specifically noting that she was very sensitive to touch and loud noises. Although she was more socially withdrawn ███████████ was revealed and she was harassed by students and some of their parents, now she has difficulty being alone and tries to avoid being alone. Mary Claire in response to a question regarding sexual orientation indicates that she may be "bisexual, but unsure." She related that she lacks "experience" with men "because of ██████" adding "they [men] scare me. It scares me to think of them in a sexual way." She struggles with feelings of helplessness and hopelessness "all the time." She denied any history of self-injurious behavior.

Despite current depressive symptomatology, Mary Claire related that her anxious symptomatology is more disturbing and disabling. She described her anxiety as "paralyzing in a way." She described frequent obsessive thoughts about "ideas, something that's happened, reminders of what happened, just about anything." These thoughts are often accompanied by nausea and food avoidance because her "stomach is always flipping," sometimes in a manageable way, but sometimes in a "dramatic" way," and at those times she finds food "disgusting." Her anxiety is often precipitated by social situations, and she described "lots" of social anxiety and frequently "overthinking" social situations. She noted that alcohol decreases her anxiety, at least in the immediate/short-term, and she began using more alcohol to decrease ████████████████ She endorsed panic attacks, particularly when she is alone, and some "stress is going on," although there are no specific precipitants. They were more frequent during her senior year, but until March or April they had decreased to a few times a year, and consist of crying, inability to catch her breath, and increased heart rate.

Mary Claire related always being in a highly anxious state, even at baseline, which is relieved temporarily by alcohol or the medication Klonopin, but stated "I don't want Klonopin to be in my future." She described obsessive thoughts that interfere with functioning and are "exhausting." She related that she does not know exactly when the obsessive thoughts began, but clearly have increased since her senior year of high school and continue to the present day. The obsessive thoughts are characteristic of obsessive-compulsive disorder (OCD)[7] and consist of looking for patterns "everywhere," including in "stuff on the ground," adding and subtracting numbers, and intrusive thoughts such as "if the light turned green, this will happen or be true." She recognizes that the thoughts are not based in reality, but cannot stop thinking them. She also reported compulsively picking at her eyebrows, eyelids, and eyelashes.

PTSD-related intrusion symptoms, avoidance, alterations in arousal and reactivity, and negative alterations in thoughts and mood associated ████████████ and aftermath were endorsed by Mary Claire. She noted that she avoids sex and "touching." She also endorsed nightmares and

---

[7] According to the *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-5)*, obsessive compulsive disorder is characterized by the presence of obsessions and/or compulsions. Obsessions are recurrent and persistent thoughts, urges or images that are experienced as intrusive and unwanted. Compulsions are repetitive behaviors or mental acts that the person feels driven to perform in response to obsessions or according to rigidly applied rules. Trauma and other stressful events are associated with an increased risk for developing OCD.

"waking up in a panic." She recalled a nightmare about a month ago in which she was "screaming, 'why don't you believe me?" and awakened "freaking out," but could not recall the actual content of the dream. Mary Claire related that after the ███████████ December 2016 she began to ████████████████████████████████."



She felt guilty and had recurrent intrusive thoughts not only ████████████ but also thoughts that it was "my fault," and questioning herself repeatedly "How did I manage to let that happen?" ████████████████████████, she wondered if she had invited ████████████ "subconsciously." ███████████████████ the group, some aspects ██████████ and ███████

Alterations in arousal reported by Mary Claire include hypervigilance, which Mary Claire described as "increased awareness-constantly looking around and expecting the worst to happen all the time." She described herself as being "on high alert." She reported being extremely irritable and "annoyed with everything," and while she denied any physical aggression, she reported "snapping" at family and friends "for nothing." Reckless behavior took the form of alcohol abuse in order to feel like a "zombie," stating that during her senior year and for a year or two after that she could not understand why anyone would "drink if you're not going to black out." She also combined Klonopin and alcohol on a couple of occasions, but not in over a year.

Mary Claire reported a DUI in October of 2020 which was pled to a reckless driving misdemeanor by her report. She had to attend a 12-week program in order to have her license reinstated. By her report she currently drinks alcohol one to two times a week, typically beer or seltzers, but about six or seven cans or bottles each time. Her last intoxication by her report was 1 week ago. However, about a week prior to the completion of this report, she saw a former Newman student and "            supporter" in a Savannah restaurant/bar and was so overwhelmed that she drank to the point of intoxication again. She denied any other substance use or abuse.

In February of 2021 her 21-year-old cousin who had a history of depression and anxiety by her report died of an overdose of fentanyl. Mary Claire related that he became dependent on opioids, and after his physician who had been prescribing Percocet for pain secondary to an injury would no longer prescribe them for him, he began using illicitly purchased fentanyl. She was close to him, and his death was difficult for her.

Dissociative symptomatology was reported in the form of "zoning out," during which time Mary Claire does not "recognize" people around her, and the "date feels off and does not make sense." As previously noted, Mary Claire does have a seizure disorder, but was very clear that she can differentiate between the two, stating "I can't explain [the difference] in words, but I can differentiate the feeling." She did note that she has a sense of when a seizure is about to

happen,[8] whereas the "zoning out" is more abrupt.  During these episodes of zoning out, she experiences depersonalization (the feeling of being detached from her physical presence) and derealization (in which she feels like her environment is unreal or dreamlike).  Mary Claire was unclear as to what precipitates these experiences, noting that she experienced an increase in the fall of 2020, then a slight diminishing in the frequency, with an increase again in April.  She now experiences these dissociative episodes a few times a week by her report.  She was also unclear as to when they began, but was clear that she had never had them ████████████

Mary Claire reported difficulty with "over-analyzing body language" of others, even when nothing sexual is anticipated or feared.  ███████████████████████████.  She also refused to use the shower in the bathroom she was assaulted in even though that was her bathroom.  From that time on, she showered in her brother's bathroom, but would do so late at night because she did not want to call attention to the fact that she was avoiding showering in her own bathroom, as she did not want her parents to worry. ████████████████████████

Mary Claire recalled emotional distress at reminders ████████  and recurrent efforts on her part to minimize and rationalize what she was going through.  For example, she recalled that she repeatedly told herself, ██████████████████," but then would immediately think "for the first time ever in my life," which intensified her distress. Mary Claire reported feeling extremely anxious when she saw ████████ in school, and felt "guilt" because ██████████████ ████ recalled, but decided "I might as well suck it up." Mary Claire recalled receiving a text from █████████, ███████," ██████████████████, texted Mary Claire, "███████████████████

Mary Claire was asked for specifics with respect to the nature of the harassment at Newman. She indicated that it was so frequent and pervasive that it is difficult to recall specific incidents, but some stand out in her mind.  She related that the mother of a close friend "helped gather evidence," against her by "stalking" her social media all the way back to 2015 in an effort to indicate that Mary Claire was "crazy" and a "psycho lesbian," and presented that information to the school. She stated that there were many parents who "loved to gossip and get involved in their kids' lives" and were "living through their kids."  However, she added that "some of the teachers were amazing," and she has fond memories of teachers and counselors whom she felt were supportive of her and tried to mitigate the effects of the abuse, but the administration of Newman were not supportive, by her report, and did not intervene even when the sexual harassment and bullying intensified.

Mary Claire recalled when she discovered that ████ had written the essay indicating that she was ███████████ not believing her best friend when she told ████ ██████████████.  "I remember that moment so well," said Mary Claire, adding, "I was flattered ██████ . . . Sure enough, later that night my parents told me ████ mother]

---

[8]  This feeling that a seizure is about to happen is known as an "aura." An aura is actually part of a simple partial or focal seizure (which Ms. McCoy has been diagnosed with and is treated with lamotrigine for).


called." Mrs. C called to let her parents know that the police had come to their home to ask about the ███████.

Mary Clair was very clear that the aftermath of the revelation of ████████ was much more traumatizing than the ████████. She stated, "I never would have been in the shape I'm in now," had she not been subjected to the harassment that followed the revelation. "Ignorance is bliss," she related, explaining that she would never have been traumatized by the school's response (and lack of an appropriate response) to the bullying and harassment of students and their parents ████████ ████████ She recalled that nearly every day she left school after lunch because she could not tolerate the atmosphere. She recalled losing friends and "the parents were the worst." She recalled that "it started off slow and I thought people had my back," but then "things really started picking up from November to January." By "picking up" she explained that students began engaging in blatant sexual harassment, such as wearing buttons in support of ████ with his face on them, yelling "████████," chanting his name, and calling out "innocent until proven guilty," when they knew she was within earshot.

Mary Claire recalled coming to school late one day and seeing students wearing buttons with ████' photo on them. Mary Claire went to the Head of Upper School's office "sobbing," and felt that he "completely dismissed me." She recalled him saying "there is intent verses impact," as an excuse for ██ and ██ distributing the buttons, which she interpreted as meaning that ██ was excused because he supposedly did not recognize the impact that students wearing buttons with ████████████████. Mary Claire noted that a couple of teachers were supportive and told some of the students that they had in class to take the buttons off. However, throughout the school year she was exposed to some students who continued to keep the buttons pinned to their knapsacks/book bags.

She reported that students and administrators began to avoid her. People who had previously sat with her at lunch began sitting at different tables, and she would sometimes be all alone. She recalled Mr. Hesse saying to her, "you have no say in anything happening," in response to her question as to whether not she had any say with respect to how the school was handling the situation. She also recalled that the administration did "nothing" about the "fat heads" that were held by parents and students at a football game. Mary Claire stated that she was not at the game, but she received photos taken by peers that revealed students and parents in the bleachers holding the fat heads and she saw them in her snapchat. Mary Claire reported that Nowell Hesse's "solution" to her distress was "go home." She recalled the day that he asked her when she was "planning to go home," and she told him she didn't know, at which point he told her that ████████ was coming to school for a game. She reported than when she complained about the harassment, Mr. Hesse indicated that he could not shut down "free expression" or "free speech." She reported that he claimed that the harassment by influential parents was "not in our control." When she complained about HC and CD "mocking" her, she was told that their behavior did not "rise to the level" of consequences. Mary Claire recalled telling Mr. Hesse that she was afraid of ████████ and being told by Mr. Hesse, "Ok, I see where you're coming from, but think about it realistically," which Mary Claire felt was "dismissive" of her fears.

"[       ] and I tried to make something positive come out of it," Mary Clare recalled, referencing her and ██ creating exhibits for the school art festival in hopes of also being accepted to show them at a prestigious art show in Dallas, Texas.  However, according to Mary Claire, Nowell Hesse and Kim Wargo refused to let them exhibit some of their best work, claiming that it was "too much" and too controversial.

She recalled ████████████, the mother of a friend, spreading stories about Mary Claire lying about the ████████ and being unreliable because she had been involved with another friend in egging "Boo's" house.  (Mary Claire related that she subsequently went back and apologized and cleaned it up).  She recalled that the father of "the triplets," ████████, confronted Mary Claire and ██ after graduation, at an event at a restaurant that the graduating class and their parents went to, and "pushed" ██ and threatened them, calling them liars.

Mary Claire reported that during her sophomore year at college a classmate sent unsolicited "dick picks," to her as well as to some other female students, but she dealt with this by avoiding him rather than reporting him because she overheard him "bragging about having turned his entire [high] school against a girl."  She stated that she did not inquire further but it made her "really angry" as it brought up memories of what had happened to her.  She related that one of the sequelae ████████████ and the harassment she received at school, including harassment by schoolmates and their parents, is "resentment toward men in general."  She described having intercourse with a male that she had a "good relationship" with but not enjoying it and "still thinking about it [████████████]," After that experience, she decided that she did not want to have any more sexual encounters, with either men or women.

In addition to anxiety and depression, Mary Claire endorsed significant struggles with "so much anger and resentment," noting, "I try my best to avoiding thinking about that whole situation," and so has trouble understanding why she is so angry.  In addition to the anger she feels about ████████ and how she was treated at Isidore Newman School by students, parents, and school administration, she is angry at the toll it has taken on her parents.

**Collateral Interviews**

*D. Dillard McCoy*:
Mr. McCoy, Mary Claire's father, reported that prior ████████████ his daughter was shy, and he and his wife noted this trait from an early age.  However, after the ████████ ████████, he noted that she became increasingly withdrawn and depressed. He noted that she began to withdraw to her room more and showed a decreased interest in team sports, and began sleeping more while complaining that she could not get enough sleep and was tired.  However, he noted a dramatic escalation in anxious and depressive symptoms coinciding with the harassment she endured when the ████████████.

Mr. McCoy recalled feeling "rage," when his wife met him in a coffee shop and told him that Mary Clare revealed she had been ████████████ ████████ but then immediately shifted to what he and the family could do to "help Mary Claire."  Mary Claire repeatedly told them that she did not want the incident made public.  They met with Mary

Claire's therapist, a psychologist with prescribing privileges (Dr. Michael Major), who had been seeing Mary Claire for anxiety and depression and ███████████████ (a handwritten note dated December 28 or December 29, 2016 documents this). Mr. McCoy recalled that Dr. Major informed them that they had ███████████████, but Mary Claire was clear that she did not ███████████████, and Mr. and Mrs. McCoy asked him not to report it "fearing how [Mary Claire] would handle this going forward."[9] He states in a note that the family, including Mary Claire, agreed to keep ███████████"

Mr. McCoy was clear that it was Isidore Newman School who initiated the investigation after ███ revelation that she was ███████████████ not believing a friend who told her she ███████.

Mr. McCoy recalled that he and his wife were called by ███ mother informing them that the police had come to their home and asked     to identify the ███████████████, but told them that she did not believe that it was her place to do so. The McCoys, including Mary Claire, reportedly discussed the situation, and Mary Claire gave her permission to be identified.

The following day, Mary Claire's mother (Carla McCoy) met with the school guidance counselors, Mimi Ryan and Michael Simon. They indicated that school personnel were mandated reporters and had to ███████████████. At that point, according to Mr. McCoy, it was an "open" ███████████████████████ other confirmed t███████████████ The school reportedly told the McCoys they would be launching an "independent evaluation," which the family could "chose to participate in or not participate in," and in consultation with Mary Claire agreed to participate (meaning they would agree to be interviewed). Mr. McCoy stated that the school urged them not to discuss it with anyone and that Mary Claire's identity would be protected, and that ███████ and his parents would not be told who was making the complaint. Mr. McCoy related that he and his family "trusted" Mr. Nowell Hesse (the Head of the Upper School) and Newman School, and the family did as they were asked.

In retrospect, Mr. McCoy realized that other parents in the school were made aware of ███████ very early on, despite the assurances of Mr. Hesse that Mary Claire's anonymity would be protected, and being told by Mr. Hesse not to ███████████ or investigation. He recalls that he and his wife went to a party at the end of October 2017 to watch the LSU/Alabama football game at the home of a neighbor (who had been on the Board of Newman School at some point) whom they considered to be friends. He recalled that there were a number of guests there, also affiliated in some way with Newman. "They were distant and standoffish," he recalled, and he and his wife "had no idea why." He recalled discussing with his wife when they returned home how "odd" it was that they had gotten such a "cold reception" at this party with people who they had known for years. He later discovered that his daughter was already being "defamed," and that people at the party were already talking about ███████.

---

[9] Mr. McCoy indicated that Dr. Major told them that he knew "the boy's parents," and would be willing to speak to them; however, the McCoys declined. ███████████████████████

Mr. and Mrs. McCoy then began to receive phone calls from parents advising them to call off the investigation (even though the school initiated it, indicating that Newman was mandated to investigate). Mr. McCoy recalled that a few days after the party his wife received a call from a Newman mother "urging us to drop it," and that ███████ had passed a lie detector test. He and his wife were "double teamed," in that the husband of this woman called him a couple of days later with the same urging to "drop it." Additional calls from parents ensued by his report. Mr. McCoy recalled that the focus of these parental urgings was on the harm the investigation could do to ███████ and Newman, but "no one asked about our daughter."

Mr. McCoy recalled that when he found out about the buttons (he can't recall if Mary Claire or ███████ initially alerted him), he texted Nowell Hesse that same day and was told that he hadn't heard anything about it, and was told by Mr. Hesse, "I'll look into it." Mr. McCoy stated that this was Mr. Hesse's typical response to his complaints about how Mary Claire was being demeaned and harassed, but "that would be it." Mr. Hesse reportedly also told Mr. McCoy later that he saw only a couple of kids wearing the buttons, and that he "couldn't stop kids from exercising their right to free speech." Mary Claire did not want to return to Newman after that incident, and Mr. McCoy related that he and his wife have felt guilty and wondered if they should have just had her transferred to another school or remain at home, despite the fact that she had attended Newman since preschool and it was the middle of her senior year. They discussed how that would affect her college applications, and decided to encourage Mary Claire to "tough it out" at Newman, with the attitude, "Don't let them beat you."[10] Mr. McCoy recalled parents telling them that having an investigation was problematic as it could be "bad for the school," both in terms of reputation and finances. He recalled Mr. Hesse at some point after the independent investigation had been completed asking Mr. McCoy if he wasre willing to "mediate," and asking, "What do you want Dillard?" Mr. McCoy recalled answering. "What does that mean—what do I want? I want you to stand by the results of the investigation." He stated that he believes Mr. Hesse was indirectly indicating that a monetary sum could make the matter "go away."

Mr. McCoy was asked how he believes and has observed these events to have effected Mary Claire. He related that prior ███████ she was a "Daddy's girl," but "now I don't think she trusts anyone, especially men." He recalled that she was always "hard-headed like me," which he explained means she has a stubborn streak, but became "hardened," "dark," and "angry and bitter." He stated that Mary Claire was always somewhat quiet and on the shy side, not "bubbly and outgoing," but he observed her "withdrawing" more ███████, and this intensified with the harassment she experienced at Newman. She began "drinking to excess," by his report. He recalled that her efforts to reconnect with friends who had abandoned her, rationalizing and making excuses for why they had done what they did, as "heartbreaking," as she would be "re-hurt."

He recalled that on New Year's Eve of her senior year at Newman she told a group of her friends that she was going to kill herself because of them (however, he was unaware that she was

---

[10] Mr. McCoy's voice broke at this point in the interview, and he was clearly struggling to regain composure. He acknowledged that he "broke down thinking about it," adding, "Why did we let her go to school?"

actually holding a knife to her throat). He related that he believes that her relationship with him suffered because although there are times when he thinks she has felt closer to him, because "she knows I will stick up for her," he thinks that she is also disappointed in him for "allowing her to be in this position," with respect to the sexual harassment and bullying at school. McCoy related that the events at Newman during the 2017-18 academic year preoccupied him in a way that interfered in a variety of ways including work and family relationships. He said, "Let me put it this way--it was the first thing I thought about in the morning and the last thing I thought of every night."

As previously noted, Mr. McCoy related that shyness was noted from an early age, and Mary Claire was in therapy for "shyness" and frequent abdominal pain related to shyness and anxiety. She has always been fearful of "making a mistake and being embarrassed," by his recollection, and the events at Newman fueled her worst fears.

Mr. McCoy also expressed regret and worries that we "neglected ███████ We tried our best to be there for him," but wishes that he and his wife had "insisted that ██████ get therapy." He related that ███████ was deeply affected by the events, not only because he is very close with Mary Claire, his twin, but also because he lost friends, and experienced the effects of Mary Claire's shunning and the school's unwillingness to intervene and take action against blatant harassment and provocation, which he recalled were "daily" occurrences and involved "all kinds of ridiculous stuff," which was not dealt with appropriately by the school. As another example, he related how upsetting it was that one of girls who turned on Mary Claire during her senior year had been "treated like a daughter growing up" by the McCoys. This girl's mother reportedly emailed the school that Mary Claire was threatening to harm herself and "causing angst among the girls."[11]

Mr. McCoy noted that Mary Claire always has increased anxiety when she is in New Orleans and avoids coming home. He stated that she "worries about seeing them [students from Newman who were cruel to her] and has "bad memories." "She's happier away from home," he said. He related that even during the pandemic when her brothers Connor and ██████ came home to New Orleans, Mary Claire stayed in Savannah.

Mr. McCoy related that he received a call at 10:30 pm from Mary Claire a few days after our first interview. Mary Claire was "panicked" because she had seen one of her former friends (OB) who had been a vocal ██████ supporter, as were her parents, in a restaurant or bar in Savannah. "She was totally freaked out" he recalled, and he and his wife had to "talk her down," telling her, "This is your town; you live there, not her; go back in there; you've got this; be proud of who you are." He related that it doesn't take much to precipitate a panic attack and "bring it all back" for her. In a subsequent interview, Mr. McCoy related that during a family vacation a week earlier to a beach in Florida, Mary Claire was "obsessing" about how OB might "invite others" (Newman alumni who had harassed her during her senior year) and she did not think she could face them. "This isn't going away," he stated.

---

[11] A variety of emails from parents impugning Mary Claire's character sent to Ms. Atkins and Newman school personnel were reviewed, including those accusing her of being a "lesbian," and "a liar a vandal, a thief, and a drug addict."

*Carla McCoy*

Mary Claire's mother, Carla McCoy, was also interviewed for this evaluation. She recalled that when Mary Claire told her mother about being sexually assaulted by ██████, Mary Claire was distraught. Ms. McCoy told her, ██████," but Mary Claire did not want it reported, noting the reactions of her close friends, who expressed more concern for her assaulter than for her. Her mother recalled Mary Claire saying about her friends, "Nobody is understanding what it did to me," and Ms. McCoy noted her mood as becoming "more down," and that Mary Claire "shut down." Ms. McCoy related that she was adamant that no one know ██████, saying, "They won't believe me . . . They won't like me." However, within a couple of months, according to Ms. McCoy, "[██] got it," and told Mary Claire that she believed her.

Ms. McCoy related, as have all the other informants for this evaluation, that ██s response to a school assignment (██████████████ prompted the school to contact the police who went to ████ home to question her about the identity of the friend who was sexually assaulted (apparently the teacher made the correct assumption that it was another Newman student). ████ mother reportedly called Ms. McCoy and told them that the police had questioned ████ but that ██ did not give them Mary Claire's name. Ms. McCoy recalled that the family discussed it with Mary Clare, and Ms. McCoy went to the school, met with Newman guidance counselors and told them confidentially that it was Mary Claire who was identified in ████ essay.



Ms. McCoy related that at first it appeared that Newman was supportive and would "protect" Mary Claire. She stated that the school had been supportive and appropriate when bullying of ████████ and Mary Claire occurred in 9th grade. Ms. McCoy recalled that administrators told her that ████████ would be withheld from school pending the results of an independent evaluation in which Mary Claire could choose to participate or choose not to participate. Ms. McCoy related that she was told that if Mary Claire participated in the evaluation, her name would not be revealed to ████████. Reportedly, Mr. Hesse related that ████████ would not be allowed to return to school during the course of the investigation, but if Mary Claire chose not to participate it was likely that the investigation would not yield any results given the lack of participation on the part of the identified victim. After discussion with Mary Claire, the McCoys told the school that Mary Claire would participate. Ms. McCoy related that Mr. Hesse told the family to keep the fact that there was an ongoing investigation confidential and not discuss it with anyone, and the McCoys agreed.

Ms. McCoy reported getting phone calls from parents urging them to "drop" the investigation despite her explanations that the school was doing what it had to do "by law," and that the McCoys were told by Newman that an investigation was necessary. Other parents told her that Mary Claire had precipitated "an ugly mess that is going to ruin their senior year." Mary Claire and her parents were also accused of "tearing the class apart," and were repeatedly asked "why did you have to get the school involved?" Concern for Mary Claire's welfare was not expressed, according to Ms. McCoy.

It quickly became clear, according to Ms. McCoy, that "it got out of our hands," and that the fact that there was an investigation was not kept confidential, and that Mary Claire was "in a den of wolves," with no one in the Newman administration to support or defend her. "It gutted her," recalled Ms. McCoy. Only her guidance counselors and a couple of teachers were supportive, "but no one in administration," noting that there were "no consequences" for the harassment and provocation her daughter endured. She recalled that Mary Claire frequently came home in tears and was so exhausted that she typically came home and went directly to bed. She did not eat dinner with the family, indicating that she couldn't eat. She recalled that Mary Claire called her from school nearly every day crying and begging to be allowed to come home. "Sometimes I let her come home," Ms. McCoy remembered, adding, "She was just so defeated." She related that Mary Claire became "paranoid," which she explained as meaning that Mary Claire was fearful that parents or other students, including ███████████ would actually do something physically to harm her.

The incident in which students were wearing buttons in support of ███████████ with his picture on them was Ms. McCoy's "first indication of the lengths they would go to" to humiliate and coerce Mary Claire. She remembered Mary Claire calling her from school "sobbing," and Ms. McCoy could barely understand what she was saying, other than "They're wearing buttons." "We couldn't believe it," she recalled, noting the "shock" and "devastation" she felt at the recognition that this campaign of bullying and intimidation went far beyond pointedly avoiding and ignoring Mary Claire. She recalled that Nowell Hesse's response was "lackadaisical," and he professed to not know anything about it, and then "referenced something about freedom of speech."

The fat head incident (parents and students holding up fat heads/posters of ███████) at a Newman football game was also very upsetting to Mary Claire as people had taken pictures and posted them, which she saw, although she was not at the game. Ms. McCoy related that Newman "brought him on campus" despite assurances to the McCoys that this would not happen. Ms. McCoy recalled that "parents kept calling and emailing the school" with "information" and "false accusations" to impugn Mary Claire, which contributed to her anxiety, depression, and fear of additional harmful repercussions. For example, the school administration questioned Mary Claire and ████ about keying ███████████ car and demanded hand writing samples, based on emails from ███████████ mother. (According to Ms. McCoy, it was later determined that ████████ ███████████.) Mary Claire was "crushed" by "having to defend herself against false accusations," telling her mother, "It's like I've done something wrong," adding that Mary Claire "couldn't believe that it ███████████] was turned around like that."

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Ms. McCoy related that her daughter continues to have "an overall lack of trust" and that "her self-confidence took such a hit." She related that Mary Claire had trouble applying for jobs, noting anxiety being around people she doesn't know, but eventually was able to apply for and accepted a job this summer at an art museum. Her mother thinks that the fact that she is doing well in school with her photography has provided some boost to her deflated self-esteem. Her mother wistfully remarked that she had thought that her severe anxiety would get better "when she was not seeing Newman people, but it didn't get better in Savannah."

She recalled that graduation, which is "a big moment in kids' lives," was "terrible," noting Mary Claire and _____ were treated "like outsiders." Even after graduation, according to Ms. McCoy, Mary Claire remained anxious, depressed, and isolated with "anxiety through the roof about everything." She was terrified of seeing the Newman students who had harassed and bullied her or their parents. Her mother related that she became fearful that Mary Claire "was not going to make it to college," and those fears came to fruition when they arrived in Savannah and Mary Claire begged to be allowed to come home when her mother was about to leave and go back to New Orleans, crying, "I can't go through with it. . . . I'm not strong enough; it's too much." Ms. McCoy recalled that she had to remain in Savannah with Mary Claire for a week and find an "emergency therapist," given Mary Claire's high level of anxiety and panic. Ms. McCoy had to drive her to her classes that week, and she was moved to a different dorm. However, Mary Claire "hates to come home," according to her mother, and is avoidant to any reminders of her traumatic experiences.

According to Ms. McCoy, ████████████
Ms. McCoy related that the family, including Mary Claire, made the decision to ███████████
██████████████ "rescinded the findings" of the independent investigation, and the McCoys feared that ███████ would receive a diploma from Newman and the school was acting in a way that "looked like they believed that Mary Claire made it up and caused drama." Ms. McCoy stated that ████████
Mary Claire was in support of the ██████ │ ███████████████████████

Savannah. Ms. McCoy recalled that prior to the hearing several of their family members asked if Mary Claire and her parents wanted them to come to court for support, and the McCoys declined, indicating, that it would have been "in poor taste" and appear as though they were gloating. However, they received a "punch to the gut," when _____ had a "cheering section" of Newman parents present in court. She estimated the presence of "at least ten parents and friends," who subsequently told people that they charges were all dropped, reinforcing the idea that Mary Clare made the accusation up.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

on it." He recalled Mary Claire scooting up to walk with him and ███ on their way home from the party, but did not know why. He also recalled that in Mary Claire's room, she said that she needed to go to the bathroom and ███████ immediately said, "Oh me too."[12]

████████ stated that Mary Claire told him that ████████████████ and told him "not to tell anyone." He recalled her as being ████████ ██████████████, who then relayed the information to her father with Mary Claire. ██████████ recalled that his parents wanted to ████████████, Mary Claire did not. He surmised that Mary Claire "knew what would happen." When asked for specifics with respect to what that meant, he answered that the school was known for "uptown people," who were wealthy, "gossipy, and love drama and rumors." He stated that many of the parents are "reliving high school through their children." ████████████, ████████ noted changes in Mary Claire. He perceived her as more "withdrawn," and "trying her best to compose herself," but she became increasingly anxious and "paranoid." By paranoid he explained that she frequently feared that ██████████ would "do something again."

By his recollection, the "distancing of friends" began in mid-November. He recalled that a parent or board member called his parents and told them he showed his sons a documentary about a woman who had lied about ████████████, implying that a similar situation existed with Mary Claire's report. He stated that there were so many instances of cruelty and harassment that he can no longer recall them in sequence. "Every single day there was some new rumor," he recalled. He recalled that Mary Claire was being "presented" that year the Harlequin Ball, but she was so anxious about going that ██████████ and her parents had to convince her to go, lest those harassing and bullying her "win." She did "get picked," and although ██████████ perceived it as a "screw you" to those who had harassed her, Mary Claire was miserable at the ball.

████████ recalled Mary Claire's reaction to the buttons and fatheads as "heartbreaking." He had tried to stop her from coming to school when he and ███ saw the buttons being given out, but then saw Mary Claire come in late and "my heart just dropped." She was "in shock," he recalled, "You could tell by her face she was devastated," he said, when she saw her classmates wearing the buttons with ██████████ face on them. ████████ recalled a couple of the teachers and guidance counselor telling a few students, "take that button off," but "administration did nothing." Mary Claire left school early, telling him "I can't take this." However, despite Mr. Hesse citing free speech as the reason he could do nothing about the buttons, the school would not allow Mary Claire and ███ to display much of their art at the art show according to ████████, indicating it would "stir things up." According to ████████ and Mary Claire had done some paintings of Mary Claire with a hand over her mouth and around the border of the work, they had written comments that were frequently made about sexual abuse victims, as well as those made to Mary Claire, but the school would not allow it to be shown. He reported that he, Mary Claire, and ███ went to Kim Wargo, the Associate Head of School, about the unfairness of it, and were told by ██████████ report, "It's out of my hands."

████ reiterated the "unfairness" of the situation in that the McCoys had done as the school asked with respect to "keeping quiet," so as not to interfere with Newman's investigation, but "the ███ took a different approach." "We trusted and obeyed the school," ████ recalled, who stated that he believes that the cards were stacked against Mary Claire from the beginning



████, who had been a major force behind the buttons and fat heads. Mary Claire was told about an hour before he arrived, and left early, but still ran into parents arriving for the festivities, which ████ recalled as highly upsetting to his sister, as these were some of the same parents who had called his parents urging them to "drop it," and who had spread disinformation about Mary Claire. ████ recalled that "the changes" in Mary Claire became more pronounced "every month." He recalled that someone who worked in the cafeteria (who may have known nothing about the situation) teased Mary Claire and suggested she could win "the most tardies award." "She dreaded school," recalled ████, noting that a day at school "just exhausted her. . . . You could see it taking more of a toll every day." She quit the track team; she experienced panic attacks, which he described as "overwhelming emotion," in which she could not stop crying and was unable to catch her breath.

████ recalled that Mary Claire had "so much anxiety" the first week she was at SCAD and almost had to come home. He stated that she had "trust issues" since so many friends whom she had considered to be loyal and true abandoned her at Newman and that the school that she had attended since she was age 4 did not support her, and was fearful that the same thing would happen at SCAD. According to ████, Mary Claire always "anticipates the worst," and if there is any planned social event, she "needs every tiny detail about who will be there, what time it will end, etc. . . . She needs to have everything planned out." He perceives her as still struggling, and although she has never voiced suicidal ideation or planning to him, she has told him, "It feels like I'm dead," by his report.

████ recalled feeling isolated and targeted and also "lost friends" and was avoided at Newman over the revelation of the abuse and the resultant fallout. He recalled that a tradition at Newman was an all-night "after party" organized by a parent for the senior class, with the class going to watch the sunrise at 6 am. He recalled that the mother of CS organized the party, but he, Mary Claire, and ████ were not invited.

████ reported that he became increasingly anxious and depressed as he witnessed what his sister was subjected to and witnessed her increasing depression and anxiety; however, he kept it to himself as he did not want to burden his parents or Mary Claire. He described sadness, decreased sleep, decreased concentration, decreased pleasure in previously pleasurable activities, and decreased energy, which was highly distressing and compromised his academic functioning. His description of his symptoms indicates that he experienced a major depressive episode. He also acknowledged contemplating suicide, but never acted on it. Even though he was not as shunned as intensely as Mary Claire, he began to avoid going to parties or events he was invited to. However, he stated, "I didn't want my parents spending money on me for therapists or doctors; we needed to focus on Mary Claire." He related that although his mood has improved,

he continues to experience sadness, anger, and intermittent chest pain, which he ascribes to anxiety.  With the recent increase in events related to litigation, he has been forced to recall what happened during his senior year at Newman.  "All the memories make my chest and heart hurt," he acknowledged.

███, Mary Clair's best friend at Isidore Newman, was interviewed on June 25, 2021 for this evaluation and recalled that Mary Claire was "shunned" by most of the senior class when ██████████ became known, and ████ along with her for remaining her friend.  ████ recalled that on the night ██████████████, Mary Clare came back into her bedroom after leaving to go to the bathroom and told ████ hat ██████████ leaving.  ████ recalled that she got up from the bed and went to say goodbye to him and kissed him.  When she came back in, Mary Claire ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ she felt "torn."  ████ recalled that Mary Claire sent a text to their close friend group (about seven girls) ██████████████ █████████, and the responses she received were disheartening, including several responses urging her to "be careful" who she told or she would "hurt ████" and "ruin ████████ reputation."  ████ recalled that Mary Claire was distressed that her close friends of many years would worry more about ████████ than her, and Mary Claire chose ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

████ recalled that a few weeks later she discovered that ████████████████████ ████████████████████ She related that she subsequently texted saying something to the effect of, "we've broken up now so tell me what happened with Mary Claire," and he subsequently blocked her calls/texts.  ████ recalled that ████ was her first boyfriend and she was "very inexperienced," but also struggled with anxiety and had difficulty asserting herself.  She stated that her solution ███████████████████████████ ███████████████████ ████ ███████ ████████████ ███████████████████████████████████████████████████████████████

████ recalled that after the school initiated an investigation (prompted by her written response to a question about what she was most ashamed of) into the ██████████████, the first repercussion that she noticed was that Mary Claire (and ██ by extension) "stopped being invited to things."  Although their small group of friends were already aware of ████████ from Mary Claire's text to them soon after it occurred, until the school's involvement, Mary Claire and ████ continued to be invited to parties and to their friends' homes.  However, after the school became



aware and involved, both girls were increasingly shunned and isolated by their peers and even some school staff. recalled that even the school nurse who had previously been friendly would look away or pretend to be engaged in something so as to avoid speaking with them. believes that much of the ostracism was encouraged by some parents who pressured the school, for reasons that are unclear other than potential financial concerns (several parents threatened to withhold contributions to the school's annual fundraiser in support of [redacted]) and the fact that [redacted] parents had social connections to wealthy parents and school personnel. recalled that several peers privately came up to her and Mary Claire and acknowledged support and sympathy for Mary Claire but said they were afraid of speaking out or socializing with them for fear of receiving similar treatment and ostracism.

stated that there was an area at the school called "The Commons" where students congregate with friends on breaks and between classes. noted that after the investigation of the [redacted] was made public, peers avoided her and Mary Claire, and when she and Mary Claire were in The Commons, they sat alone, with their other classmates "on the other side of the room talking to ." Early on in the course of the ostracism, if they sat at a lunch table with peers, they were pointedly avoided, so they began sitting alone at another table. Newman administration was well aware of this by her report. She stated that there were only about 80 students in their graduating class, and "everyone knew everyone." She recalled that when she walked with Mary Claire, they would be subjected to chanting of [redacted] name and random call-outs, "innocent until proven guilty."

indicated that the one of the most confusing aspects of the situation was the fact that when first came to Newman in the [redacted] remembered that when she began dating him, boys in their class came up to her and asked her why she was dating him. recalled that she told them, "Well, he likes me so I'm going to give him a chance." However, "as soon as it got out that he had [redacted]l." Again, she indicated that several "wealthy and powerful parents" played a role, sympathizing with [redacted] and urging their children to make sure that [redacted] was invited to their homes. recalled how distressing it was for Mary Claire to be bombarded weekly with Snapchat pictures of [redacted] at the homes (even after he was [redacted] and get-togethers of peers who had been her friends, which she believes were sent with the clear message, "he's here, and you're not."

, as did Mary Claire, related that a few teachers, and Ms. Mimi Ryan, their guidance counselor, were supportive and empathic, but the administration appeared dismissive of their concerns. She recalled the incident in which [redacted] friends met students at the door of Newman and handed out buttons with [redacted] photo on them. recalled that Mary Claire was "so depressed by that point that she could barely get out of bed," and therefore was late to school that morning as she had been many other days since the harassment began. However, [redacted] and Mary Claire's [redacted] saw them being handed out by [redacted] friends, [redacted] and CD. She recalled that almost all of the boys wore the buttons, and some of the girls. She recalled that [redacted] attempted to warn Mary Claire not to come to school, but it was too late. recalled that when they went to Nowell Hesse to complain and ask him to do something, he

told them that there was nothing he could do, telling them he could not tell them to remove the buttons and it was their "choice" to wear a button and citing free speech. She also recalled him defending the button distributors and wearers, nothing that their "intent" was not to be hurtful. She also recalled parents and students holding up fat heads of ▮▮ at a football game.

▮▮ stated that it is difficult to separate out or recall many of the individual incidents because "it was all so intense my memory is a blur, and I don't recall every specific incident." Both she and Mary Claire had been students at Newman since preschool. ▮▮ allowed that Mary Claire was "different," explaining that she "didn't care about the same things" like wealth and social status as their peer group, was not "girly and fake," and "dressed differently," causing speculation about her being a lesbian, which circulated in parent-driven emails (reviewed in the records provided) to the school, along with cannabis use, which ▮▮ reported was highly exaggerated, stating, "yeah, like maybe one time a year." She recalled that several very vocal and intense mothers trolled Mary Claire's twitter feed and Facebook for what they perceived to be damning evidence that she was a "liar."

▮▮ stated that alternative theories of the most vocal ▮▮ supporters and their parents were that Mary Claire was "crazy and made the whole thing up—she's a lesbian who smokes weed," and that ▮▮ made the story up to get revenge on ▮▮ for cheating on her and Mary Claire was "so crazy she went along with it." The distress and shock were intensified by peers and parents "who had known us our whole lives" turning on them and the school enabling it, by her report.

▮▮ also stated that harassment for her friendship with Mary Claire followed her to Tulane where she is currently a student. Although her mother is a legacy Chi Omega and ▮▮ "made the list" during rush for membership in the sorority, she was "dropped" mysteriously, and later discovered that "someone on ▮▮ side" sent the sorority a letter indicating that ▮▮ should not be accepted because "she's trouble." She also discovered that several Tulane professors with children at Newman had made negative comments about her to others.

▮▮ related that Mary Claire missed a lot of school secondary to depression and anxiety related to the abuse she endured related her experiences at Newman. She recalled that both girls spent much time in Ms. Ryan's office, and their grades suffered. "We suffered mentally and academically," ▮▮ recalled, noting that what should have been an exciting milestone in their lives, their senior year, was "horrible." ▮▮ also stated that ▮▮ was at the "after party" in a restaurant after their graduation. She reported that she and Mary Claire had to walk past a group of parents on their way to the bathroom, and the father of one of their former friends who became a ▮▮ "supporter," yelled at them to, "get away from me and my wife," grabbed ▮▮s arm, and pushed her.

## Opinions

It is my opinion to a reasonable degree of medical certainty that Mary Claire McCoy was subjected to emotionally traumatizing harassment and abuse by the students and parents of Isidore Newman School. The harassment and abuse were conducted publicly on school grounds

and at school functions and was unremitting and relentless. Isidore Newman School did not act to stop the harassment and abuse that Mary Claire McCoy experienced on a daily basis.

In my opinion to a reasonable degree of medical certainty, Mary Claire has suffered severe long-term emotional damage, which has had significant negative repercussions with respect to her mental health, educational attainment, relationships, and functioning in multiple domains.

In my opinion to a reasonable degree of medical certainty, Mary Claire McCoy meets the following DSM-5 criteria for PTSD.

A. She experienced █████████████████████████████ by ████████ in ██████████████, and she was repeatedly and chronically harassed when ████████ came to light, which intensified the impact ██████████████. Isidore Newman School administration allowed a traumatizing and destructive environment to develop and flourish on and off campus in which Mary Claire McCoy was denigrated, maligned, and hounded, which was not only traumatizing in and of itself, but precipitated constant reminders of the ██████████.

B. Presence of one or more intrusion symptoms associated with the sexual abuse, beginning after the trauma occurred (Mary Claire currently experiences all five symptoms, all of which were exacerbated by the harassing behavior perpetuated by Newman students and parents, and the lack of an appropriate response to ██████████████ by another Newman student):
   1. Recurrent, involuntary distressing memories of the traumatic event
   2. Recurrent distressing dreams in which the content and/or emotion are related to the traumatic event
   3. Dissociative reactions in the form of flashbacks
   4. Intense psychological distress at exposure to internal and/or external cues that remind her of the trauma
   5. Marked physiological reactions to internal or external cures that symbolize or resemble the trauma

C. Persistent avoidance of stimuli that are associated with the trauma, beginning after the trauma, as manifested by one or more of the following (Mary Claire continues to experience both manifestations):
   1. Avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the trauma
   2. Avoidance of or efforts to avoid external reminders that arouse distressing memories, thoughts, or feelings about or are closely associated with the traumatic event

D. Negative alterations in cognitions and mood associated with the traumatic event, beginning after the trauma, as evidence by two or more symptoms. As described above in this report, Mary Claire experiences six symptoms including:

1. Inability to remember an important aspect of the traumatic event (inability to recall getting back to her room after the ████████ and what happened immediately afterward).
2. Persistent and exaggerated negative beliefs or expectations about oneself, others, or the world
3. Persistent, distorted cognitions about the cause or consequences of the traumatic event that lead to blaming herself
4. Presence of persistent negative emotional states
5. Markedly diminished interest or participation in significant activities
6. Feelings of detachment or estrangement from others
7. Persistent inability to experience positive emotions

E. Marked alterations in arousal and reactivity associated with the traumatic events, beginning after the trauma occurred, as evidence by two or more symptoms. Mary Claire has experienced five symptoms:
   1. Irritable behavior when angry outbursts with little or no provocation typically expressed as verbal aggression
   2. Reckless or self-destructive behavior
   3. Hypervigilance
   4. Problems with concentration
   5. Sleep disturbance

F. The duration of the disturbance has been greater than 1 month. The duration has been over 4 years.

G. The disturbance has caused and continues to cause clinically significant distress and impairment in social, occupational, and other important areas of functioning.

H. The disturbance is not attributable to the physiological effects of substances or another medical condition.

In my opinion to a reasonable degree of certainty, Mary Claire meets DSM-5 criteria for the diagnosis of Panic Disorder, without Agoraphobia.

A. Mary Claire experienced frequent unexplained panic attacks (an abrupt surge of intense fear or discomfort that reaches a peak with minutes, and during which four or more of the following symptoms are present):
   1. Palpitations, pounding heart, or accelerated heart rate (present)
   2. Sweating (present)
   3. Trembling or shaking (present)
   4. Sensation of shortness of breath or smothering (present)
   5. Feelings of choking
   6. Chest pain or discomfort (present)
   7. Nausea or abdominal distress (present)
   8. Feeling dizzy, unsteady, lightheaded, or faint (present)

9. Chills or heat sensations
10. Numbness or tingling sensations
11. Derealization (feelings of unreality) or depersonalization (feeling as though one is detached from oneself)—present
12. Fear of losing control or "going crazy" (present)
13. Fear of dying

Mary Claire experiences nine of the above symptoms during panic attacks.

B.   At least one of the attacks has been followed by one month or more of one or both of the following:
1. Persistent concern or worry about additional panic attacks or their consequences
2. A significant maladaptive change in behavior related to the attacks

Mary Claire experiences both of the above symptoms during panic attacks.

In my opinion to a reasonable degree of medical certainty, Mary Claire also meets DSM-5 criteria for the diagnosis of Major Depressive Disorder (MDD), severe, recurrent, currently experiencing the full range of symptoms and dysfunction required for a diagnosis of MDD--five or more symptoms present for more than a 2-week interval, representing a change from her previous baseline functioning, including both depressed mood and loss of interest or pleasure. Her symptoms during major depressive episodes include:

1. Depressed, hopeless mood nearly every day.  In my opinion her irritability is more related to PTSD than MDD.
2. Markedly diminished interest or pleasure in most activities.
3. Sleep disturbance (difficulty falling and staying asleep without the aid of medication)
4. Decreased appetite
5. Fatigue and loss of energy daily.
6. Feelings of worthlessness and inappropriate guilt daily.
7. Diminished ability to think or concentrate
8. Suicidal ideation

Mary Claire also meets criteria for Alcohol Use Disorder, mild.  Mild severity is diagnosed due to:
1. Alcohol use in larger amounts than intended
2. A strong desire to use alcohol (to curb anxious and depressive symptoms)
3. Continued use despite having gotten a DUI

As previously noted, May Claire has experienced symptomatology compatible with Obsessive Compulsive Disorder (OCD) given persistent thoughts and images that are experienced as intrusive and unwanted; however, her PTSD symptomatology (specifically severe intrusion symptoms previously described) makes it difficult to differentiate OCD from PTSD. Trauma is associated with an increased risk for developing OCD.

Mary Claire's diagnosis of Generalized Anxiety Disorder (GAD) ████████████████ and sexual harassment and bullying at Newman.   GAD is characterized by excessive anxiety and worry more days than not about a variety of activities (social, school, work).  Her premorbid anxiety and depression made her more vulnerable to the negative effects of ████████ and the harassment and bullying at Newman.  In my opinion to a reasonable degree of medical certainty, the severity of Mary Claire's impairment is a direct result of Newman's lack of response ████████████████ by ████████ the toxicity she experienced at Newman, and Newman's contribution to that toxic environment.

Litigation is often associated with an increase in symptomatology as one is forced to anticipate recalling traumatic experiences; however, in my opinion to a reasonable degree of medical certainty, Mary Claire's current PTSD and depressive symptomatology and the dysfunction associated with it are not primarily related to litigation and will persist long after this case is resolved.

The neurobiological systems that regulate stress responses include a variety of endocrine and neurotransmitter pathways as well as a variety of brain regions known to regulate fear at both the conscious and unconscious levels.  Symptoms of hyperarousal, dissociation, anxiety, numbing, avoidance, and emotional and behavioral dysregulation (all of which Mary Claire has experienced) are examples of PTSD symptomatology that have been functionally linked with neurobiological features of PTSD.

*Severity of Symptoms*
In my opinion to a reasonable degree of medical certainty, Mary Claire McCoy was sexually assaulted and traumatized in December 2016 and re-traumatized during her entire senior year at Isidore Newman School.  In my opinion to a reasonable degree of medical certainty, there are three major reasons for the persistence and severity of Mary Claire's symptoms:
1. ████████ (along with combat) is highly correlated with the development of PTSD.
2. The sexual harassment and bullying she experienced at Newman School lasted many months.
3. She experienced dissociation ████████ and continues to experience dissociative symptoms.  Dissociation has been linked with treatment resistance in a number of studies.

*Prognosis, Permanency, and Related Health Risks*
It is my opinion to a reasonable degree of medical certainty that Mary Claire McCoy has developed a chronic form of PTSD secondary to the being sexually assaulted, and her symptomatology is likely to persist indefinitely.  It is likely that these symptoms will continue to negatively impact her relationships and her social and occupational functioning significantly.  An increasing body of research indicates that PTSD is also associated with much physical morbidity, including chronic musculoskeletal pain, hypertension, hyperlipidemia, eating disorders, obesity, endocrine abnormalities, and cardiovascular disease.  Several mechanisms for the relationship have been proposed including biological responses to stress, emotion-focused coping strategies (for example, avoidance), psychiatric co-morbidities such as depression, and maladaptive coping strategies such as substance use and problematic eating patterns (which Mary Claire has already developed).

In my opinion to a reasonable degree of medical certainty, Mary Claire will continue to live with the psychiatric, emotional and behavioral impacts of the sexual violence she experienced in 2016 and the traumatizing emotional abuse she endured during her senior year (2017-2018) at Isidore Newman School. By way of illustration, the following chart demonstrates that at 10 years post trauma, approximately 40 percent of trauma victims with PTSD who had been treated were still symptomatic. As seen from the figure below,[13] PTSD failed to remit in more than one third of persons even after many years. The likelihood that Mary Claire will be in that life-persistent group is increased by the fact that the initial trauma she experienced was sexual, it occurred over 4 years ago and she is still symptomatic, and she experienced dissociation ███████ and continues to experience dissociative symptoms.



**Figure 2.** *Survival curves based on duration of symptoms for respondents who did and did not receive treatment for posttraumatic stress disorder.*

ARCH GEN PSYCHIATRY/VOL 52, DEC 1995

In my opinion, continued risks for Mary Claire include alcohol use (which she has acknowledged using to excess in the past as a means of coping with her anxiety and depression related to the sexual and emotional abuse) continued work-related difficulties secondary to PTSD and depression, including irritability, anger, and avoidance; continued impairment in her relationships with friends and family; and continued problems with intimacy.

In my opinion to a reasonable degree of medical certainty that future treatment will need to include ongoing cognitive-behavior therapy at least weekly, with likely additions of other modalities such as cognitive processing therapy (more specific to PTSD with dissociation), as well as pharmacotherapy (medications) by a psychiatrist for an indefinite period of time. The trauma that Mary Claire experienced has likely permanently altered her neurobiological makeup, and similar to a diabetic who will require insulin for the rest of his or her life, Mary Claire will continue to require treatment addressing PTSD, recurrent major depression, and panic attacks.

---

[13] Kessler ███ Sonnega A, Bromet E et al. Posttraumatic Stress Disorder in the National Comorbidity Survey. Arch Gen Psychiatry. 1995. 52:1048-1060.

It is recommended that that Mary Claire continue in psychiatric treatment with a psychiatrist who who has expertise in treating PTSD comorbid with treatment-resistant major depression. However, PTSD is less responsive to psychopharmacologic treatment than is depression. It is unlikely that she will see the same psychiatrist indefinitely, and it is typical to perform a full psychiatric evaluation yearly, especially in the face of recurrent or treatment-resistant symptoms, in addition to the follow-up pharmacotherapy visits. It is my opinion to a reasonable degree of medical certainty that Mary Claire will require medication to ameliorate her depression and anxiety disorders indefinitely. In the best case scenario, cognitive behavioral and other psychotherapeutic modalities specifically addressing symptomatology directly related to trauma would be required twice weekly for 6 months, then weekly for at least 5 years, then monthly for monitoring and "booster sessions."

Given Mary Claire's strengths (intelligence), reasons for living (family), and motivation to get better, it is hoped that with the appropriate therapies she can make significant improvement; however, it needs to be recognized t█████████████████████████████████████ ██████████████████████d was followed by vicious and sustained emotional abuse and harassment by peers whom she thought were her friends (as well as adults), and she continues to suffer severe disability in all areas of functioning (social, educational/professional, and emotional).

In my opinion to a reasonable degree of medical certainty, more intensive and sustained treatment will likely be indicated, including treatment in a dual diagnosis residential treatment facility specializing in trauma and alcohol abuse for 30 to 90 days, with step down to an intensive outpatient program for 6 to 8 weeks before resuming weekly or twice weekly individual therapy and psychiatry follow-up on monthly basis (weekly for symptom exacerbations). In my opinion to a reasonable degree of medical certainty the severity and chronicity of her symptomatology, especially her PTSD symptomatology, will require this higher level of care at some point in her adult life.

My opinion reflects the information available to me at the time of this report, and I may amend it if additional information becomes available. I hope that the information contained in this report is clear. Please feel free to contact me at 614-685-5602 with any questions or concerns.

Sincerely,

Eileen P. Ryan, DO
Professor of Psychiatry and Behavioral Health
Vice Chair of Clinical Services
The Ohio State University Wexner Medical Center

Transcript of the Testimony of
# Videotaped Deposition of Mary Claire McCoy (Testimony Under Protective Order)

**Date taken: July 29, 2021**

**Mary Claire L. McCoy v. Isidore Newman School and**

██████████████

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

EXHIBIT
B

Page 1

                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA


MARY CLAIRE L. MCCOY          CIVIL ACTION


VERSUS                        NO. 19-01810


ISIDORE NEWMAN SCHOOL         SECTION: S(5)
AND ▬▬▬▬▬▬▬▬▬▬


        ***TESTIMONY UNDER PROTECTIVE ORDER***


            VIDEOTAPED DEPOSITION OF MARY CLAIRE
McCOY, 1132 SONIAT STREET, NEW ORLEANS, LOUISIANA
70115, TAKEN IN THE OFFICES OF TAGGART MORTON,
LLC, 1100 POYDRAS STREET, SUITE 2100, NEW ORLEANS,
LOUISIANA 70163, ON THE 29TH DAY OF JULY, 2021.


APPEARANCES:


    THE FIERBERG NATIONAL LAW GROUP
    (BY:  MONICA BECK, ESQUIRE)
    161 EAST FRONT STREET
    SUITE 200
    TRAVERSE CITY, MICHIGAN 49684


        - and -


    TAGGART MORTON, LLC
    (BY:  KEVIN M. WHEELER, ESQUIRE)
    1100 POYDRAS STREET
    SUITE 2100
    NEW ORLEANS, LOUISIANA 70163


      ATTORNEYS FOR PLAINTIFF

Page 2

```
 1   APPEARANCES CONTINUED:

 2

         PHELPS DUNBAR
 3       (BY:  HARRY ROSENBERG, ESQUIRE)
         (BY:  KIM M. BOYLE, ESQUIRE)
 4       (BY:  REBECCA SHA, ESQUIRE)
         365 CANAL STREET
 5       20TH FLOOR
         NEW ORLEANS, LOUISIANA 70130

 6
           ATTORNEYS FOR DEFENDANTS
 7

 8   REPORTED BY:

 9       CATHY RENEE´ POWELL, CCR
         PROFESSIONAL SHORTHAND REPORTERS
10       (504)529-5255
         www.psrdocs.com

11

12   VIDEOGRAPHER:

13     BRANDON KIEM
       LEGAL GRAPHICWORKS
14     (504)650-8070

15

     REPORTED BY:
16
         CATHY RENEE´ POWELL, CCR
17       PROFESSIONAL SHORTHAND REPORTERS
         (504)529-5255
18       www.psrdocs.com

19          *   *   *   *   *   *   *   *

20   PORTION OF TRANSCRIPT FLAGGED AT MS. BOYLE'S

21   REQUEST: ...........................42

22

23                    *    *    *

24                 EXAMINATION INDEX

25   EXAMINATION BY MS. BOYLE .............13
```

Case 2:19-cv-01170-MVL-MBN BEALED Document 209-7 Filed 08/24/21 Page 59 of 105

Videotaped Deposition of Mary Claire McCoy (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School and ████████

Page 3

1                      *    *    *

2                 INDEX OF EXHIBITS

3    Exhibit No. 1  ......................25

4      Notice of Video Deposition.

5    Exhibit No. 2  .....................103

6      McCoy school records.

7    Exhibit No. 3  .....................103

8      Protective Order.

9    Exhibit No. 4  .....................137

10     Handwritten document "Facts About Me,

11     Newman0000537.0027-0028_CONF_PO.

12   Exhibit No. 5  .....................231

13     Report of Investigation, Confidential, Isidore

14     Newman School, December 15, 2017,

15     Newman0000183.000001_CONF_PO-0002235.

16   Exhibit No. 6  .....................263

17     Number not used.

18   Exhibit No. 7  .....................263

19     Email chain, first shown dated 12-5-2017 from

20     Dillard McCoy to Nowell Hesse, Subject: FW:

21     Your Saturday evening trip with Uber,

22     PLAINTIFF 000244-247.

23   Exhibit No. 8  .....................264

24     Social media posts, PLAINTIFF 000252-256.

25   Exhibit No. 9  .....................268

Page 4

```
 1     Email dated 1-29-2018 from Dillard McCoy to

 2     Kim Wargo, Subject: RE: Meeting with Mary

 3     Claire, Newman00161_CONF_PO.

 4   Exhibit No. 10  ....................282

 5     Absence Analysis Detail: 8-1-2016 - 5-31-2017,

 6     Mary Claire McCoy, '18,

 7     Newman0000180.001_CONF_PO-0000024.

 8   Exhibit No. 11  ....................283

 9     Email dated 12-22-2017 from Jennifer Hardin to

10     Dale Smith, Kim Wargo, Subject: FW: Incident

11     Report submitted, Newman0000023_CONF_PO.

12   Exhibit No. 12  ....................284

13     Email dated 12-22-2017 from Jennifer Hardin to

14     Dale Smith, Kim Wargo, Subject: FW: Incident

15     Report Submitted, Newman0000024_CONF_PO.

16   Exhibit No. 13  ....................285

17     Email dated 1-12-2018, from Jennifer Hardin to

18     Nowell Hesse, Subject: FW Pictures,

19     Newman0000027_CONF-PO.

20   Exhibit No. 14  ....................286

21     Email dated 3-14-2018, from Nowell Hesse to

22     Jennifer Hardin, Subject: FW Incident Report

23     Submitted, Newman0000061_CONF-PO.

24   Exhibit No. 15  ....................287

25     Email dated 1-19-2018, from Jennifer Hardin to
```

Page 5

1    Mary Claire McCoy, Subject: ██ left campus,
2    Newman0000069_CONF-PO.
3  Exhibit No. 16  .....................288
4    Email dated 1-12-2018, from Newman Security to
5    Jennifer Hardin, Subject: Incident Report
6    Submitted, Newman0000113_CONF-PO.
7  Exhibit No. 17  .....................289
8    Email dated 1-31-2018, from Nowell Hesse to
9    Mary Claire McCoy, Subject: Following up,
10    Newman0000144_CONF-PO.
11  Exhibit No. 18  .....................289
12    Series of messages,
13    Newman0000211.0001_CONF_PO-0008.
14  Exhibit No. 19  .....................292
15    Email dated 12-23-2017, from Mary Claire McCoy
16    to Kim Wargo, cc Nowell Hesse, Subject:
17    Update, Newman0000334.0001_CONF_PO.
18  Exhibit No. 20  .....................293
19    Email chain, first shown dated 1-29-2018 from
20    Kim Wargo to Dillard McCoy, Nowell Hesse,
21    Subject: RE: Meeting with Mary Claire McCoy,
22    Newman0000426.0001-CONF_PO-0003.
23  Exhibit No. 21  .....................294
24    Email chain, first shown dated 1-19-2018 from
25    Kim Wargo to Mary Claire McCoy, cc Nowell

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Page 6

1    Hesse, Subject: RE: Remedies,

2    Newman0000438.0001_CONF_PO-0002.

3  Exhibit No. 22  ....................295

4    Email dated 11-6-2017 from Robyn McCormick to

5    Alma Nicholson, Meghann Niehus, et al., cc

6    Anna Yarborough, Nowell Hesse, Subject: MCM,

7    Newman0000392.0001_CONF_PO.

8  Exhibit No. 23  ....................295

9    Email dated 1-12-2018 from Mary Claire McCoy

10   to Nowell Hesse, Subject: RE: ██████ Update,

11   Newman0000442.0001_CONF_PO.

12 Exhibit No. 24  ....................296

13   Email dated 12-17-2017 from Jennifer Hardin to

14   Jennifer Hardin, Subject: RE: Incident report

15   submitted: Memo to File,

16   Newman0000476.0001_CONF_PO-0002.

17 Exhibit No. 25  ....................297

18   Email dated 12-23-2017 from Dale Smith to Kim

19   Wargo, Subject: Re: Updates and concerns,

20   Newman0000505.00001_CONF_PO.

21 Exhibit No. 26  ....................298

22   Email dated 1-19-2018 from Michael Simon to

23   Mary Claire McCoy and ████████████,

24   Newman0000519.00001_CONF_PO.

25 Exhibit No. 27  ....................299

Videotaped Deposition of Mary Claire McCoy (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School and █████████

Page 7

```
 1      Email dated 3-22-2018 from Nowell Hesse to
 2      █████████, Mary Claire McCoy, Subject: Stop
 3      by, Newman0000530.0001_CONF_PO.
 4    Exhibit No. 28  .....................300
 5      Email dated January 16, 2018 from Mimi Ryan to
 6      Mary Claire McCoy, Subject: Checking in,
 7      Newman0000540_CONF_PO.
 8    Exhibit No. 29  .....................300
 9      Email dated January 3, 2018 from Mimi Ryan to
10      Mary Claire McCoy, Dillard McCoy, Subject:
11      Referral information, Newman0000541_CONF_PO.
12    Exhibit No. 30  .....................301
13      Letter dated February 5, 2018, to Mr. and Mrs.
14      Dillard McCoy from Kim Wargo, PLAINTIFF
15      000141.
16    Exhibit No. 31  .....................302
17      Email dated 10-31-2018 from Dale Smith to
18      Jennifer Hardin, attaching social media
19      postings, Newman0000030_CONF_PO-40.
20    Exhibit No. 32  .....................305
21      Email dated 12-5-17 from Nowell Hesse to
22      Margaret Charbonnet, cc Dale Smith, Subject:
23      RE: █████████ tweets,
24      Newman0000132_CONF_PO.
25    Exhibit No. 33  .....................306
```

Page 8

1    Email dated 11-20-2017 from Mimi Ryan to
2    Nowell Hesse and Kim Wargo, Subject: For Your
3    Information, Newman0000145_CONF_PO.
4  Exhibit No. 34  .....................306
5    Email chain, first shown dated 2-5-2018 from
6    Mimi Ryan to Jennifer Hardin, Subject: FW:
7    Friday's stalking and abuse,
8    Newman0000200.0001_CONF_PO-002.
9  Exhibit No. 35  .....................308
10    Email chain, first shown dated 12-5-17 from
11    Nowell Hesse to Dale Smith, Kim Wargo,
12    Subject: FW: ███████████ tweets, RE: ██████
13    ██████ tweets, Newman0000365.0001_CONF_PO-02.
14  Exhibit No. 36  .....................309
15    Email chain, first shown dated 12-7-17 from
16    Nowell Hesse to Dale Smith, Kim Wargo,
17    Jennifer Hardin, Subject: FW: Mary Claire new
18    tweet, with attachment,
19    Newman0000380.0001_CONF_PO-0000381.0001.
20  Exhibit No. 37  .....................309
21    Email chain, first shown dated 12-7-17 from
22    Margaret Charbonnet to Nowell Hesse, cc Robyn
23    McCormick, Subject: Re: Mary Claire new tweet,
24    Newman0000419.0001_CONF_PO.
25  Exhibit No. 38  .....................310

Page 9

```
 1    Email dated 1-3-2018 from Ashley Keller to
 2    Mimi Ryan, Subject: ██████████ - Concern,
 3    Newman0000532.0001_CONF_PO.
 4  Exhibit No. 39  ...................311
 5    Email chain, first shown dated 11-17-2017 from
 6    Dillard McCoy to Ashley Keller Nelson,
 7    Subject: Re; The Kids & You, PLAINTIFF
 8    000018-19.
 9  Exhibit No. 40  ...................313
10    Email chain, first shown dated 2-12-2018 from
11    Dillard McCoy to Kim Wargo, cc Nowell Hesse,
12    Subject: Re: Meeting with Mary Claire,
13    PLAINTIFF 000142.
14  Exhibit No. 41  ...................313
15    In globo exhibit, multiple texts, PLAINTIFF
16    000054-75.
17  Exhibit No. 42  ...................316
18    Email chain, first shown dated 2-3-2020 from
19    Andrew Rodgers to Lisa Goff, Subject: FW:
20    Show, Newman0000374.00001_CONF_PO.
21  Exhibit No. 43  ...................319
22    Email dated 2-7-2018, from Mimi Ryan to Mary
23    Claire McCoy and ██████████, cc Michael
24    Simon, Subject: Followup on art festival,
25    Newman0000510.00001_CONF_PO.
```

Professional Shorthand Reporters, Inc.
Offices in New Orleans and Baton Rouge
1-800-536-5255
www.psrdocs.com

Videotaped Deposition of Mary Claire McCoy (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School and ███████

Page 10

1  Exhibit No. 44  ....................320
2     Email chain, first shown dated 4-16-2018 from
3     Andrew Rodgers to Mimi Ryan, Subject: FW:
4     Senior Art Show & Newman Film Festival,
5     Newman0000516.0001_CONF_PO-00002.
6  Exhibit No. 45  ....................321
7     Email dated 2-3-2020 from Andrew Rodgers to
8     Lisa Goff, Subject: FW: ISAS Artwork,
9     Newman00520.0001_CONF_PO.
10 Exhibit No. 46  ....................322
11    Mary Claire McCoy artwork.
12 Exhibit No. 47  ....................324
13    Mary Claire McCoy's photography, PLAINTIFF
14    000082-84.
15 Exhibit No. 48  ....................327
16    Nell Nolan story in "Times-Picayune,"
17    Harlequins Debutante Ball.
18 Exhibit No. 49  ....................328
19    Photograph of ███████ button, PLAINTIFF
20    000120.
21 Exhibit No. 50  ....................328
22    Mary Claire McCoy's photography, PLAINTIFF
23    000648-649.
24 Exhibit No. 51  ....................330
25    Letter dated July 23, 2021, to Kim Boyle,

Page 11

1    Esquire, Phelps Dunbar, from SCAD, Re: Mary

2    Claire McCoy's student records (attaching

3    same).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 44

1    do you believe that any other parents had an

2    impact on what you consider to be the harassment

3    or the bullying or the treatment of you during

4    your senior year at Newman?

5            MS. BECK:

6                  Object to the form of the question,

7        answer if you understand it.

8            THE WITNESS:

9                  Do I believe any other parents?

10   EXAMINATION BY MS. BOYLE:

11       Q.    Aside from the ██████ because we already

12   talked about them.

13       A.    Yes, absolutely.

14       Q.    So tell me which parents, if you can

15   recall, had some impact on either harassing you or

16   bullying you in some respect, and I am talking

17   about during your senior year, '17 to 2018.

18       A.    Yes.  Mary Schmidt, Pam and Vance

19   Reynoir, Hackitt Cummins' mother, Lynn Brown, Boo

20   Charbonnet, don't know the first names and last

21   names, Davis, last name is Reynolds, Ashley

22   Nelson, Mary Ann Moss, Ellie Lane, and the last

23   name is Charbonnet, but not Boo Charbonnet.

24       Q.    Another Charbonnet?

25       A.    Yes.

Videotaped Deposition of Mary Claire McCoy (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School and █████████

```
                                                 Page 45

 1        Q.    Okay, got you.

 2        A.    And I believe -- oh, yeah.  Peter Moss,

 3   I believe is his name.

 4        Q.    So this is a █████ separate from --

 5        A.    It is the husband of Mary Ann Moss.

 6        Q.    Anybody else you recall, ma'am?

 7        A.    The Gertlers, and I believe that's it.

 8        Q.    So let's go through so I can have the

 9   names of the students connected with

10   their parents.  Mary Schmidt?

11        A.    ███████████████.

12        Q.    And he was an actual classmate, not just

13   a schoolmate?

14        A.    Yes.

15        Q.    Pam and Vance Reynoir?

16        A.    ████████████████████████████████████████

17   ███████████████████.

18        Q.    And they were all in your class?

19        A.    Uh-huh (affirmative response).

20         MS. BECK:

21             That's "yes"?

22         THE WITNESS:

23             Yes.

24   EXAMINATION BY MS. BOYLE:

25        Q.    Is Lynn Brown the student or the parent,
```

Page 46

```
 1   ma'am?

 2        A.   Parent.

 3        Q.   Do you remember that child's name?

 4        A.   ████████

 5        Q.   ████████    And she was in your class,

 6   ma'am?

 7        A.   Yes.

 8        Q.   ██████████████, her daughter is ████████

 9        A.   Yes.

10        Q.   ██████████, is that ███████████?

11        A.   Yes.

12        Q.   █████████, who is the child?

13        A.   ███████████.

14        Q.   And was he in your class?

15        A.   Yes.

16        Q.   And you said Moss, do you remember which

17   child?

18        A.   ███████████, he was two grades below.

19        Q.   Two grades below?

20        A.   Or a grade below, sure.

21        Q.   Just not in your class?

22        A.   ████████.

23        Q.   ██████    The other Charbonnet, who was her

24   child?

25        A.   ████████
```

Page 47

1     Q.   And was ██████ in your class, ma'am?

2     A.   Yes.

3     Q.   And ████████ is connected to the first

4  ████?

5     A.   Yes.

6     Q.   Are they divorced, is that why you named

7  them separately?

8     A.   No, I just remembered later on who was

9  involved.

10     Q.   And the Gertlers, who is their child?

11     A.   ████████████.

12     Q.   And was he in your class?

13     A.   Yes.

14     Q.   Now, for all of these individuals you

15  named, and I will go over it again so you can tell

16  me if you think I left someone out, Mary Schmidt,

17  ████████████████████, ███████████' mom, █████

18  ████████████, ███████████' mom, ██████

19  ██████' mom, ████████████, ██████'s mom,

20  ████████████'s mom, ████████, who is

21  connected to the other █████ and Zachary Gertler?

22     A.   And ██████ ██████.

23     Q.   Is ██████ the parent or the kid?

24     A.   The parent.

25     Q.   And who is the child?

Page 48

```
 1      A.    ███████████.

 2      Q.    Have you taken any legal action against

 3  any of these individuals you just named?

 4      A.    No.

 5      Q.    So no suits filed against Schmidt?

 6         MS. BECK:

 7             Objection, asked and answered.

 8         THE WITNESS:

 9             No.

10  EXAMINATION BY MS. BOYLE:

11      Q.    Reynoir?

12         MS. BECK:

13             Same objection.

14         THE WITNESS:

15             No.

16  EXAMINATION BY MS. BOYLE:

17      Q.    Cummins' mom?

18         MS. BECK:

19             I will make a running objection.

20         THE WITNESS:

21             No.

22  EXAMINATION BY MS. BOYLE:

23      Q.    ████████████████.

24      A.    No.

25      Q.    ██████████' mom?
```

Page 56

1    and ███████████, have you ever sued anyone

2    else?

3         A.    No.

4         Q.    Has anyone ever sued you, ma'am?

5         A.    No.

6         Q.    Can you tell me the full name of your

7    school?

8         A.    Savannah College of Art and Design.

9         Q.    To the best of your knowledge, is that a

10   highly selective school for persons who want to

11   study in the arts?

12        A.    Yes.

13        Q.    For purposes of your admission, I assume

14   you had to turn over some of your work?

15        A.    Yes.

16        Q.    And they validated it?

17        A.    Yes.

18        Q.    When you were accepted for admission,

19   did you receive any type of full or partial

20   scholarship from SCAD?

21        A.    Yes.

22        Q.    Did you receive a full scholarship?

23        A.    Partial.

24        Q.    Do you know what the scholarship covers?

25        A.    No, I don't.

Page 58

 1    A.   I don't recall.

 2    Q.   But you do recall in the last year and a

 3 half having a quarter where you had straight As?

 4    A.   Yes.

 5    Q.   Do they have things like honor roll,

 6 things of that nature?

 7    A.   They have a dean's list.

 8    Q.   Did you make the dean's list when you

 9 made the straight As?

10    A.   I have made the dean's list every

11 quarter since, I believe, sophomore year.

12    Q.   Does that increase the amount of your

13 scholarship, the fact that you are doing so well,

14 does that get you more money from SCAD, so to

15 speak?

16    A.   I believe it makes me eligible to apply

17 for more scholarships.

18    Q.   Do you plan on doing that?

19    A.   Yes.

20    Q.   So going into senior year, you intend to

21 seek more money from them in the extension of a

22 scholarship?

23    A.   Yes.

24    (Discussion off the record.)

25          VIDEOGRAPHER:

Case 2:19-cv-01017-WBV-MBN Document 291-3 Filed 03/24/21 Page 105 of 26

Page 61

1    Q.   Have you taken classes at SCAD over any
2  of the summers that you have been there?
3    A.   Yes, I am taking one right now.
4    Q.   What are you taking now?
5    A.   Survey of photography.  It's like art
6  history but photography-based.
7    Q.   Is it virtual or in person?
8    A.   It is virtual.
9    Q.   And you haven't finished that class yet?
10   A.   No.
11   Q.   Taking a class over the summer, will
12 that help you lower your hours next year, the
13 number of hours you need to graduate?
14   A.   Yes, it is helping me graduate on time.
15   Q.   If you had to describe your art,
16 Ms. McCoy, how would you describe it?
17   A.   There is a range.  I do band photography
18 a lot.
19   Q.   B-A-N-D?
20   A.   Yes.  Documentaries, but I also do
21 projects that have more thought to it, more strong
22 concepts to it that explore an idea.  That is an
23 avid fascination I have, so I kind of do
24 documentary and more concept-based photography.
25   Q.   And when you say "documentary," you

Page 62

1    don't mean a documentary I would watch on Netflix,

2    do you?

3         A.    No.

4         Q.    What do you mean by "documentary"?

5         A.    Documentary means just documenting with

6    the camera, whatever is going on in front of you.

7         Q.    Okay.

8         A.    So I will take photos of my friends'

9    bands because it is happening in front of me, so

10   that is classified as a documentary.

11        Q.    At SCAD, do you participate in any

12   extracurricular activities?

13        A.    Yes.  I work for a student-run magazine

14   called "SCAD District," and I model for SCAD.

15        Q.    Let's go back to the magazine.  Is that

16   something that is published on campus?

17        A.    No.  It is more -- yes and no.  It is

18   run by students, it is not published by SCAD, but,

19   like, you can find it on the SCAD website if you

20   looked for it.

21        Q.    So it is affiliated with SCAD?

22        A.    Yes, yes.

23        Q.    And you said you work with them, do you

24   have a particular title?  Are you an editor,

25   editor in chief?  What do you do?

Page 63

```
 1        A.    I am just an editor and photographer.
 2        Q.    Is that a paid position, ma'am?
 3        A.    No.
 4        Q.    And about how many hours a week would
 5   you say you end up working with the student-run
 6   magazine?
 7        A.    Like, 10.
 8        Q.    Is this something that someone like me
 9   could find online?
10        A.    Yes.
11        Q.    And what was the name of it again,
12   ma'am?
13        A.    "SCAD District."
14        Q.    "SCAD District"?  Okay.  Thank you.
15              And I think you said you model at SCAD?
16        A.    Yes.
17        Q.    Are you modeling for classes?
18        A.    I model for -- like, they hired me as a
19   model to model for anything they want me to do.
20        Q.    And have you done that on a regular
21   basis?
22        A.    I -- recently I haven't been doing it as
23   much, but I have done it in the past.  I did two
24   or three shoots.
25        Q.    And were you paid for that work?
```

Page 64

1      A.    Yes.

2      Q.    And were you paid by SCAD?

3      A.    Yes.

4      Q.    And do you anticipate that is something

5   you may also do your senior year, ma'am?

6      A.    Yes.

7      Q.    Does SCAD have a graduate program also?

8      A.    Yes.

9      Q.    Do you intend to attend graduate school

10   when you graduate in the spring?

11      A.    If I were to attend graduate school, it

12   would not be with SCAD.

13      Q.    You want to go someplace else?

14      A.    Yes.

15      Q.    But it is not because you have had any

16   problems or issues there, correct?

17      A.    Yeah, no.

18      Q.    Have you given any thought as to what

19   plans you may have after graduation next spring?

20      A.    I would like to move to Atlanta or

21   Nashville and eventually make my way to New York.

22   I mean, the dream is to be a band photographer of

23   some sort, but if I were to go to Atlanta, I would

24   just kind of do whatever commercial photography,

25   editorial photography they asked me to, because I

Page 65

1    would have to start somewhere.

2         Q.   To be sure I understand, when you say

3    "band photographer," you mean like Annie Leibovitz

4    with "Vanity Fair" photographing the Rolling

5    Stones?

6         A.   Yes.

7         Q.   I wanted to make sure we were talking

8    about the same thing.

9         A.   Yes.

10        Q.   And obviously "Rolling Stone," same

11   concept?

12        A.   Yes.

13        Q.   Have you envisioned where you think you

14   may be in your career in 5 years?  Five years

15   after graduation?  Have you given any thought or

16   plans as to where you might be?

17        A.   Yes, I hope -- I mean, my friends in

18   Savannah are in a band and I am their band

19   photographer, and they recently found someone who

20   wants to manage them in New York, so I hope I can

21   start off with them and see where that takes me.

22             Maybe I will stay with them the whole

23   time, maybe I will find and do other things, but

24   that is want I do.

25        Q.   I know music is completely different now

Case 2:19-cv-01013-MVL-MBN Document 120-7 Filed 03/24/21 Page 135 of 26

Page 66

1    than when I was in school.  Do bands still put out

2    albums, CDs, whatever you would call it now?

3         A.    Yes.

4         Q.    And the band you are a photographer for

5    has done that?

6         A.    Yes.

7         Q.    How many?

8         A.    Two, two singles right now.

9         Q.    And what is their name?

10        A.    Bastardane.

11        Q.    B-A-S-T-A-R-D?

12        A.    B-A-S-T-A-R-D-A-N-E.

13        Q.    And you also worked at an art museum in

14   Savannah?

15        A.    Yes.

16        Q.    Is it connected to the university,

17   ma'am?

18        A.    Yes, it is the SCAD museum.

19        Q.    What do you do there?

20        A.    I am a docent.  I just greet people and

21   answer questions that they may have.

22        Q.    Is that a paying job?

23        A.    Yes.

24        Q.    Approximately how many hours do you work

25   there a week?

Page 67

1    A.   Like, recently, like 10, 15 hours a

2  week.

3    Q.   And you intend to also do that during

4  your senior year when you go back?

5    A.   Yes.

6    Q.   Is there anything else we haven't

7  discussed as it relates to your curriculum or

8  extracurricular activities that you intend to do

9  during your senior year at SCAD, ma'am, that we

10  have not already discussed?

11      MS. BECK:

12           Object to the form of the question;

13      you can answer.

14      THE WITNESS:

15           I plan to get an internship.

16  EXAMINATION BY MS. BOYLE:

17    Q.   Do you have any places in mind in terms

18  of the internship?

19    A.   Yes.  One is a guy in Atlanta, he does

20  retouching for major magazines, and we have been

21  talking and communicating about it.  So that will

22  eventually happen.

23    Q.   But he has not yet made a final decision

24  as to whether or not he is going to engage you?

25    A.   Well, when I emailed him the first time,

Transcript of the Testimony of
# Michael Major, Psy.D., MP (Testimony Under Protective Order)

**Date taken: August 13, 2021**

**Mary Claire L. McCoy v. Isidore Newman School, et al**

All electronic deposition & exhibit files
are available at **<<<www.psrdocs.com>>>**.
Please call or e-mail reporters@psrdocs.com if you need a
**Username** and **Password**.

# Professional Shorthand Reporters, Inc.

**Phone:504-529-5255**
**Fax:504-529-5257**
**Email:reporters@psrdocs.com**
**Internet: http://www.psrdocs.com**

EXHIBIT

C

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MARY CLAIRE L. MCCOY          CIVIL ACTION


VERSUS                        NO. 19-01810


ISIDORE NEWMAN SCHOOL         SECTION: S(5)
AND ██████████████████

***TESTIMONY UNDER PROTECTIVE ORDER***

DEPOSITION OF MICHAEL J. MAJOR, PSY.D,
MP, 2738 GENERAL PERSHING, NEW ORLEANS, LOUISIANA
70115, TAKEN VIA ZOOM VIDEOCONFERENCE ON THE 13TH
DAY OF AUGUST, 2021.


APPEARANCES:


    THE FIERBERG NATIONAL LAW GROUP
    (BY:  MONICA BECK, ESQUIRE)
    161 EAST FRONT STREET
    SUITE 200
    TRAVERSE CITY, MICHIGAN 49684


        - and -


    TAGGART MORTON, LLC
    (BY:  KEVIN M. WHEELER, ESQUIRE)
    1100 POYDRAS STREET
    SUITE 2100
    NEW ORLEANS, LOUISIANA 70163


    ATTORNEYS FOR PLAINTIFF

Page 2

```
 1    APPEARANCES CONTINUED:

 2
          PHELPS DUNBAR
 3        (BY:  REBECCA SHA, ESQUIRE)
          365 CANAL STREET
 4        20TH FLOOR
          NEW ORLEANS, LOUISIANA 70130
 5
            ATTORNEYS FOR DEFENDANTS
 6
 7        CELIA CANGELOSI, ESQUIRE
          5551 CORPORATE BOULEVARD
 8        SUITE 101
          BATON ROUGE, LOUISIANA 70808
 9
            ATTORNEY FOR MICHAEL MAJOR,
10            PSY.D, MP

11
      REPORTED BY:
12
          CATHY RENEE´ POWELL, CCR
13        PROFESSIONAL SHORTHAND REPORTERS
          (504)529-5255
14        www.psrdocs.com

15                      *   *   *

16                 INDEX OF EXHIBITS

17    Exhibit No. 1  ......................7

18      Release of Medical Records signed by Mary

19      Claire McCoy.

20    Exhibit No. 2  .....................13

21      Notice of Deposition.

22    Exhibit No. 3  .....................15

23      Protective Order.

24    Exhibit No. 4  .....................41

25      Certification of Documents.
```

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 3

```
 1   Exhibit No. 5  .....................149
 2      Dr. Major's handwritten notes.
 3   Exhibit No. 6  .....................253
 4      Email chain, first shown dated 11-16-2017,
 5      from Dillard McCoy to Michael Major, Lisa
 6      Atkins, Subject: RE: Newman000032-33_CONF_PO.
 7   Exhibit No. 7  .....................255
 8      Email dated 11-20-2017, "Dear Dr. Major,"
 9      Newman0000183.00086_CONF_PO-102.
10   Exhibit No. 8  .....................261
11      Email chain, first shown dated 12-8-2017, from
12      Michael Major to Lisa Atkins, Subject: Re:
13      Office visits and notes,
14      Newman0000183.000104_CONF_PO-114.
15                       *   *   *
16                  EXAMINATION INDEX
17   EXAMINATION BY MS. SHA ................7
18
19
20
21
22
23
24
25
```

Case 2:19-cv-01410-WBV-MBN Document 129-4 Filed 08/24/20 Page 86 of 105

Page 57

1    Q.    Who was she seeing for treatment of her
2    complex partial seizures?
3    A.    By the way, I don't really know how to
4    answer that.  Looking at my notes, I thought it
5    said "third grade," but that is not correct.  I
6    don't think she had had a diagnosis.
7    Q.    So when you said it was the third grade,
8    you just misread your notes, right?
9    A.    Yes.
10   Q.    But she had it prior to seeing you,
11   correct?
12   A.    Correct.
13   Q.    What were the symptoms of her complex
14   partial seizures, do you know?
15   A.    Seizures.
16   Q.    How often?
17   A.    That was unclear.  In my record, looking
18   at her, there were lots of times she would have a
19   seizure because she would stop taking her
20   medication.  I think one time when she had
21   stopped, she said she had four seizures that week.
22   I said, "What?"  And she said, "yeah, I
23   stopped my medication."
24   Q.    Did she explain why she stopped her
25   medication?

Page 63

1      Q.   When you say her achievements were

2    delayed, are you talking about her academic

3    achievements?

4      A.   No question she struggled academically,

5    right, but, you know, and this is a little

6    psychobabble, but no, it was more of the formation

7    of oneself.  She was very immature for 16 or 17,

8    almost like an 11-year-old.

9      Q.   Do you know if Mary Claire, right when

10   she first started seeing you, going back to

11   October 1, was she on any medication other than

12   Lamictal?

13     A.   Not that I know of.

14     Q.   And so again, in October of 2015, did

15   she or her parents express a desire to put her on

16   any medication?

17     A.   I don't know whether they desired; I

18   definitely recommended it.

19     Q.   And what did you recommend?

20     A.   I recommended Lexapro, escitalopram,

21   that's the same thing, and alprazolam, Xanax, same

22   thing.

23     Q.   What kind of drug is Lexapro?

24     A.   It is an SSRI.

25     Q.   What does that treat?

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 64

1      A.   Lots of things, right.  It a serotonin

2   reuptake inhibitor, so when there is a problem

3   with serotonin or dopamine, it tries to fix that.

4      Q.   So what symptoms were you trying to

5   address by recommending Lexapro?

6      A.   I was trying to make her feel stronger,

7   less anxious and elevate her mood a little.

8      Q.   How often would she have to take that

9   Lexapro?

10      A.   Daily.  It is a blood level medication.

11      Q.   So to your knowledge or recollection,

12   how long did she take Lexapro?

13      A.   My notes say that she took it

14   approximately 1 month, 1 and a half months.

15      Q.   Do you know what dates she was on

16   Lexapro?

17      A.   She started 10-6-2015, and then a new

18   med was tried November 23, 2015.

19      Q.   What was that new med she tried after

20   November 23?

21      A.   Viibryd, spelled V as in Victor,

22   I-I-B-R-Y-D.

23      Q.   Was that also an SSRI?

24      A.   Yes.

25      Q.   How long was Mary Claire on Viibryd?

Case 2:19-cv-10811-MVL-MBN   Document 129-7   Filed 08/24/21   Page 89 of 105

Page 65

1    A.    Until April of 2016, when we moved to
2    Prozac.
3    Q.    Which is also an SSRI?
4    A.    Yes.
5    Q.    How long was she on Prozac?
6    A.    Until October of 2016.
7    Q.    Happened after October of 2016.
8          What happened after October of 2016?
9    A.    She started Remeron, also known as
10   mirtazapine.
11   Q.    How long was she on Remeron?
12   A.    My notes are inconclusive, but I know
13   soon after, she stopped that and started Cymbalta,
14    duloxetine.
15   Q.    That is a another name for Cymbalta?
16   A.    Yes.
17   Q.    So she was on Remeron for a short period
18   of time?
19   A.    That's right.
20   Q.    How long was she on Cymbalta?
21   A.    She was on Cymbalta until she terminated
22   with me.
23   Q.    So approximately October 16 until April
24   of 2018?
25   A.    Yes.

Case 2:19-cv-11466-NJB-MBN Document 124-7 Filed 08/24/21 Page 90 of 105

Page 66

1     Q.   And all those, the Lexapro, Viibryd,

2  Prozac, Remeron, Cymbalta, these are all SSRIs?

3     A.   Yes, or some variation, like an SNRI.

4     Q.   Was the intent to prescribe her these

5  medications the same?  Were you prescribing them

6  to treat the same symptoms?

7     A.   Yes.

8          By the way, I apologize.  That is why my

9  records seem fuzzy to me.  She changed to Cymbalta

10 on April 4, 2017.

11    Q.   Was she on Remeron for the duration of

12 October until 4-7-2017?

13    A.   That's correct.

14    Q.   All right.

15         Is it common to be on different types of

16 SSRIs?

17    A.   Can you ask the question again?

18    Q.   Yeah, I'm just trying to see the reason

19 why she was prescribed different SSRIs in that

20 time frame.

21    A.   Sure, one was her med compliance.  She

22 would get off the med and I would say, was that

23 even working?  Let's try another one.  Then there

24 were be side effects of the medications she did

25 not like.  Remeron was prescribed to help her with

Page 69

1          THE WITNESS:

2               Xanax, right now, is a very popular

3     medication to use during parties.  It is very

4     common because it works on the same center as

5     alcohol so if I take Xanax and a glass of

6     wine it has a synergistic effect and I get

7     messed up a lot faster so I don't have to buy

8     a bunch of alcohol, I can go right to being

9     drunk.

10              Of course, the problem is, with its

11    synergy, it makes people black out.  It's a

12    very potent combination.

13              So when you say, why would she do

14    that.  Certainly she would drink alcohol and

15    take Xanax like a lot of kids, but she would

16    also use it to not feel nervous at these

17    parties.  She had a lot of anxiety going to

18    these parties.

19  EXAMINATION BY MS. SHA:

20    Q.   Got you.

21         Were there other variations, I guess, of

22  benzodiazepine you described aside from Xanax?

23    A.   Not that I recall.

24    Q.   During your treatment of Mary Claire,

25  did you prescribe any other medication aside from

Page 71

```
1    double down for something to give her at night if

2    she has trouble sleeping.

3         Q.   Just to walk through, was Mary Claire

4    experiencing paranoia?

5         A.   Yes.

6         Q.   And you intended to prescribe Risperdal

7    to address that?

8         A.   Yes, or a dopamine blocker.  It also

9    could have been her emotional lability, right?  In

10   other words, she was a very emotional young woman

11   this would give her a little bit more control, not

12   crying so much or freaking out or having fights

13   with others.

14        Q.   When did you begin prescribing

15   Risperdal?

16        A.   It is unclear but it would be in

17   November of 2016.

18        Q.   On November 7, '16.  Prior to that, had

19   you prescribed any other dopamine blockers?

20        A.   Not that I can recall.

21        Q.   Do you know what triggered you to begin

22   prescribing Risperidone?

23        A.   Over all -- I am going to look at that

24   note quickly, okay.

25        Q.   Sure.  What page are you looking at?
```

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 90

1    drugs would have helped me with that.

2         Q.   And that is are the SSRIs you told me

3    about, correct?

4         A.   That's correct.

5         Q.   Aside from depression and you said

6    anxiety, were there other symptoms, at least as of

7    this time, talking about November 2015?

8         A.   Can you ask the question again?

9         Q.   Yes.  As of the date of this report,

10   November of 2015, did Mary Claire experience other

11   symptoms aside from the ones you mentioned,

12   besides anxiety and depression and issues with her

13   serotonin?

14        A.   Yeah, lots.

15        Q.   Can you tell me what they are?

16        A.   Sure.  She had trouble sleeping, she had

17   upset stomachs, she had scratching behavior.  She

18   had personality traits that might ultimately turn

19   into a disorder.  She had anger.  Those are the

20   ones just off the top of my head.

21        Q.   Can you explain what scratching behavior

22   is?

23        A.   I don't really know.  I remember Mimi

24   telling me in the meeting that she scratches

25   herself.  I had never noticed it.

Page 101

1  would have moved to something a little bit

2  stronger.

3       Q.   Got you.

4            The letter references that, I guess this

5  would be the second to last paragraph, it

6  references she reported to you that she nearly

7  smoked THC.  Is that marijuana?

8       A.   Yes.

9       Q.   It also says that her drinking is

10  moderate.  What is your understanding of Mary

11  Claire's usage of marijuana while she was under

12  your treatment?

13       A.   It definitely waxed and waned from heavy

14  usage to daily usage to try to stop smoking so

15  much, but it was typically a very unpleasant

16  experience for her, right, but she kept going back

17  to it, thinking maybe this time, right.

18            So again, it was, like, at the point of

19  this letter, she was probably trying not to smoke

20  at all.

21       Q.   So as of this letter, it was February of

22  2018, she was trying to not smoke marijuana; is

23  that correct?

24       A.   That's correct.

25       Q.   But you said that during the height of

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 102

1    her usage, she might have been using it every day;

2    is that correct?

3         A.    That's correct.

4         Q.    What about her alcohol habit?  What was

5    your understanding of her alcohol habits while she

6    was under your treatment?

7              MS. BECK:

8                   Objection, form.  Go ahead, sir.

9              THE WITNESS:

10                  Same response, right.  Sometimes it

11        was heavy, sometimes it was nightly.  I would

12        say most of the time she would drink like an

13        adolescent, meaning she would go to a party

14        and do four shots.  It wasn't part of her

15        regimen to reach for alcohol every day,

16        because there were times when she did that.

17   EXAMINATION BY MS. SHA:

18        Q.    Earlier we talked about a meeting you

19   had with Mary Claire's parents where you informed

20   them about her alcohol usage, do you recall

21   discussing that?

22        A.    I want to tell you, I met with them six

23   different times, right, so it was a generic, like,

24   in those meetings, there wasn't a very specific

25   date where her alcohol use was mentioned, it was

Page 112

1    and sad, and then she would have big tears about

2    something.

3            So it wasn't like did it improve and

4    we're done, or did it stay bad, you know, it was

5    very variable.

6       Q.   And it was variable throughout your

7    treatment of Mary Claire; is that correct?

8       A.   That's correct.

9       Q.   Were you aware of any suicidal thoughts

10   that Mary Claire had during your treatment of her?

11      A.   I mean, I remember one incident clearly,

12   there might have been two, but one clearly where

13   she was drinking heavily, right, and very upset

14   and said that she was suicidal at that time, that

15   it was just high drama, you know, specifically, I

16   was, like, ▮▮▮▮▮ participated in that drama with

17   her and I'm, like, your two Achille's heels' are,

18   alcohol and ▮▮▮▮▮ are not your friends.  That

19   combo is a hard one, right, because you lose a lot

20   of control over your emotional regulation.

21      Q.   Do you recall the timing of that

22   incident that you just described, where she was

23   drinking heavily and there was high drama?

24      A.   I am going to check my notes on

25   1-3-2018, and that will be page -- it's numbered

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 157

 1    with Mary Claire."  Is that right?

 2        A.    Yes.

 3        Q.    I did receive the second page of your

 4    notes and I will go ahead and share that so we can

 5    walk through it.  One moment.

 6              All right.  Do you see this document?

 7        A.    I do.

 8        Q.    So I see this is dated December 29,

 9    2016, correct?

10        A.    Yes.

11        Q.    Is this referencing the session you had

12    with Mary Claire after her incident with ██████

13    ██████?

14        A.    Yes.

15        Q.    Can you walk me through the points you

16    have on this, below this entry?

17        A.    Right.  It is an interpretation of what

18    she is saying to me, right, that they were all

19    ████████████████████████████████████ not aware of

20    what is being set up, right, that there is going

21    to be some sort of sexual activity going on,

22    right.  She might have thought there might have

23    been a three-way that was going to happen, and

24    then all of a sudden, she finds herself in sort of

25    this scene with ████████ right.

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 158

1        I see in my notes, No. 2, look, in your

2    story here, you keep saying, "when we were hooking

3    up," suggesting that she and ████ were hooking

4    ████    ████  ████         ████    ████████

5    ████████  ████████ , ████████

██  ████████████████████████

██  ████████  ████████████████████

██  ████████████████████████

██  ████████████

10        They then go numerically, No. 3, how

11   concerned she was -- that how concerned ████████

12   ████ is going to be that ████████ ████████████ , and

13   Mary Claire were hooking up and she didn't want

14   ████ to know about that.

15        Certainly, I was incredibly concerned

16   about Mary Claire, right?  She just kind of got

17   ████████████████████████████

18   again, no internal compass of what it is she

19   should do.

20        So I talked to the mom, and I don't

21   think Dillard came in.  Just a moment.  "What

22   should be our plan."

23        No, that was later.  So there were

24   two meetings with the mom and dad, okay.  "Do you

25   ████████ do anything about this?"  "No, we're good,

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 160

1    distance herself.  ███████████████████████

2    ██████████████████████████████

3            "I'm tired, I don't care, I don't want a

4    lawsuit, I am tired," and then on 2-27-18, "yeah,

5    I agree there wasn't any trauma," and then --

6    because she is going to see someone about the

7    ████████████, she is seeing another therapist.

8    I'm like, "Well, do you think you need to go?  Do

9    you think there was trauma?"

10           "No, I don't think there was any

11   trauma."

12           I was, like, "Okay, you can still go to

13   her, that's not a problem."  So her psychological

14   needs kind of just really, really stopped the

15   intensity of the fight.

16       Q.   I will have a couple of follow-up

17   questions, but also, I would like you to turn to

18   the corresponding page in Exhibit 4 for this

19   12-29-2016 entry.  I believe it is on page 45.

20   Let me know when you are there.

21       A.   Okay.

22   ███████████████████████████████████████

23   ███████████████████████████████████████

24   ███████████████████████████████████████

25   ███████████████████████████████████████

Page 248

```
 1        A.   No.

 2        Q.   Who would have made that decision?  Or,

 3   wait.  Why was she bringing up this lawsuit?

 4        A.   That would have been her dad.

 5        Q.   Okay.  Got you.

 6             So did have you discussions with her dad

 7   about his desire for Mary Claire to file a lawsuit

 8   against ██████████ and/or Newman?

 9        A.   No.

10        Q.   And you learned that from Mary Claire?

11        A.   Yes.

12        Q.   How did she feel about her dad wanting

13   her to file this lawsuit?

14             MS. BECK:

15                  Objection, form, foundation.  You

16        can answer.

17             THE WITNESS:

18                  I am just going to repeat, right,

19        she thought this was way over the top and she

20        wanted no part of it.

21   EXAMINATION BY MS. SHA:

22        Q.   There is a reference to a Mr. Hesse.

23   You see that?

24        A.   Yes.

25        Q.   Do you recall what Mary Claire told you
```

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 264

1    EXAMINATION BY MS. SHA:

2        Q.    When is the last time you spoke with

3    Mary Claire?

4        A.    I spoke to her at a Mardi Gras ball in

5    December of 2018.

6        Q.    What Mardi Gras ball was it?

7        A.    Harlequins.

8        Q.    Was this the same Harlequins you

9    referenced earlier?

10       A.    Yes.

11       Q.    And this is the same discussion you

12   referenced earlier, correct?

13       A.    Yes.

14       Q.    At any point during your treatment of

15   Mary Claire, did you ever recommend inpatient

16   treatment?

17       A.    What kind of treatment?

18       Q.    Inpatient treatment.

19       A.    No.

20       Q.    That was a "no"?

21       A.    No.

22       Q.    Okay.  Why not?

23       A.    Her symptoms were not severe enough.

24       Q.    And that was true throughout your entire

25   treatment of Mary Claire, correct?

Michael Major, Psy.D., MP (Testimony Under Protective Order)
Mary Claire L. McCoy v. Isidore Newman School, et al

Page 266

1      Q.   And what was Mary Claire's condition

2 right after the December 27, 2016, incident?

3      A.   The same.  She immediately started

4 talking about ███████████, and it was not an

5 issue for her.

6      Q.   What about her condition in the fall

7 semester of 2018, so senior year, fall semester?

8      A.   You know, I did not notice a significant

9 change in her behavior or emotional well-being in

10 the fall.

11      Q.   What about the spring of her senior

12 year?

13      A.   I am almost certain that my notes

14 indicate she was feeling better.

15      Q.   She was feeling better?  Okay.

16           The last time you saw Mary Claire was

17 April, I think you said, 17, 2018; is that

18 correct?

19      A.   Yes, ma'am.

20      Q.   Do you know why she stopped seeing you

21 as a patient?

22      A.   Her dad said -- no, I don't, but her dad

23 said that she was not going to be seeing me any

24 more.

25      Q.   He told you she --



McCoy, Maxwell
1132 Soniat Street
New Orleans, LA 70115-2918
United States
Birth Date: 10/21/1999
Enrollment: 09/01/2004
Date of Graduation: 5/30/2018

**NEWMAN** | ISIDORE NEWMAN SCHOOL

1903 Jefferson Avenue
New Orleans, LA 70115
United States
Phone: 504-899-5641
CEEB: 192-045
http://www.newmanschool.org

### *2014 - 2015     Grade: 9th     Isidore Newman School*

| | 2014-2015 | Credit |
|---|---|---|
| English I | B- | 1.00 |
| Algebra II | C | 1.00 |
| Government and Economic Systems | B | 1.00 |
| Biology | C- | 1.00 |
| Spanish IV | C+ | 1.00 |
| Film Production - Beginning | A | 1.00 |
| PE IS | Pass | 0.50 |

### *2015 - 2016     Grade: 10th     Isidore Newman School*

| | 2015-2016 | Credit |
|---|---|---|
| English II | B | 1.00 |
| Public Speaking | B | 0.50 |
| Geometry | C | 1.00 |
| World History | B | 1.00 |
| Chemistry | C+ | 1.00 |
| Spanish V | B | 1.00 |
| Photography | A- | 0.50 |
| PE IS | Pass | 0.50 |

### *2016 - 2017     Grade: 11th     Isidore Newman School*

| | 2016-2017 | Credit |
|---|---|---|
| English III | A- | 1.00 |
| Pre-Calculus | C | 1.00 |
| US History | B+ | 1.00 |
| Physics | B | 1.00 |
| Spanish VI | B | 1.00 |
| Advanced Photography | A | 0.50 |
| Art History | B- | 0.50 |
| PE IS | Pass | 0.50 |

### *2017 - 2018     Grade: 12th     Isidore Newman School*

| | 2017-2018 | Credit |
|---|---|---|
| English IV | A | 1.00 |
| Introduction to Calculus | B | 1.00 |
| Global Studies: Middle East | B+ | 1.00 |
| Genetics | B | 0.50 |
| Psychology | B | 1.00 |
| Estudios Globales América Latina | B | 1.00 |
| Advanced Photography | A | 0.50 |
| PE US | Pass | 0.50 |

**Cumulative: 2.9**

**SCALE: A+ = 4.33; A = 4.00; A- = 3.67; B+ = 3.33; B = 3.00; B- = 2.67; C+ = 2.33; C = 2.00; C- = 1.67; D = 1.00; F = 0.00**

NOTES:
- There is no published rank in class. Additional statistical information is provided on the Profile of Recent Graduates, which accompanies transcripts for application to colleges.
- Computation uses all grades except P.E.
- Transferred grades are not included.
- Grades earned in Honors and AP courses are weighted .33 in the GPA computation on a 4.0 scale.
- Passing mark is a D (65-69). Any student may repeat a course, but a D or F in a continuing course must be remediated in regular or summer session.
- Numerical grade scale: A = 100-90; B = 89-80; C = 79-70; D = 69-65; F

**EXHIBIT**

tabbies

**D**

*Anita Hedgepeth, Registrar*

1/272020

> **FILED UNDER SEAL PER COURT ORDER**

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARY CLAIRE L. MCCOY** | **CIVIL ACTION NO. 19-01810** |
| **VERSUS** | **SECTION "S"** |
| | **DISTRICT JUDGE LEMMON** |
| **ISIDORE NEWMAN SCHOOL AND** | |
| ████████████ | **MAG. DIV. (5)** |
| | **MAG. JUDGE NORTH** |

### NOTICE OF SUBMISSION

**PLEASE TAKE NOTICE** that Defendant, Isidore Newman School, has filed a Daubert Motion to Exclude or Limit the Testimony of Plaintiff's Psychiatric Expert, Dr. Eileen Ryan, which is set for submission on September 8, 2021 at 2:00 p.m. before District Judge Lemmon, United States District Court, Eastern District of Louisiana, 500 Poydras Street, Courtroom C414, New Orleans, LA 70130.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:      */s/ Harry Rosenberg*
HARRY ROSENBERG (#11465)
KIM M. BOYLE (#18133)
REBECCA SHA (#35317)
Canal Place
365 Canal Street • Suite 2000
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9100
E-mail:   harry.rosenberg@phelps.com
          kim.boyle@phelps.com
          rebecca.sha@phelps.com

**ATTORNEYS FOR DEFENDANT, ISIDORE NEWMAN SCHOOL**

## CERTIFICATE OF SERVICE

I do hereby certify that on this 24th day of August, 2021 a copy of the foregoing sealed pleading was securely emailed to the email address listed in the Court's March 20, 2020 Notice Regarding Sealed Pleadings and Facsimile Filing of Paper Documents and a copy of said filing was served via e-mail upon all counsel of record.

*/s/ Harry Rosenberg*

2